*240 OPINION
GILDEA, Chief Justice.
Appellant Mahdi Hassan Ah (“Mahdi”)[1] was convicted of one count of first-degree premeditated murder and two counts of first-degree felony murder for shooting and killing three men during a robbery of the Seward Market in Minneapolis on January 6, 2010.[2] We consolidated Mahdi’s direct appeal and his postconviction appeal. On appeal, Mahdi raises a series of arguments. First, he challenges the post-conviction court’s denial of postconviction relief. Second, Mahdi argues that the district court erred by allowing opinion testimony relating to surveillance videos that tended to identify him as the gunman. Third, Mahdi argues that the mandatory imposition of a sentence of life without the possibility of release (LWOR) violates the Eighth Amendment’s prohibition on cruel and unusual punishment under Miller v. Alabama, — U.S. -, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012). Fourth, he argues that the district court’s discretionary imposition of consecutive sentences violated the rule announced in Miller and Article I, Section 5 of the Minnesota Constitution, and that the district court abused its discretion by imposing consecutive sentences. Fifth, Mahdi raises a number of other claims in a pro se supplemental brief. Because we conclude that the post-conviction court did not err, the district court did not err in its evidentiary rulings or in imposing consecutive sentences, and Mahdi’s pro se arguments lack merit, we affirm on these issues. But because we hold that the mandatory LWOR sentence on the first-degree premeditated murder conviction is unconstitutional under Miller, we vacate that sentence and remand for resentencing on the first-degree premeditated murder conviction following a Miller hearing.
This case arises from an incident that took place on a January night in 2010. At 7:44 p.m., on January 6, two masked men walked into the Seward Market on East Franklin Avenue in Minneapolis. The first man, who had covered his face with a blue bandana, held a black semiautomatic pistol in his right hand. His accomplice, a taller man whose black-and-white striped shirt poked out from under his winter coat, entered behind him. When the men entered, Osman Elmi, an employee of the market, and Mohamed Warfa, a relative of Elmi’s, were sitting behind the store’s counter. The man with the gun thrust it in Elmi’s face and both Elmi and Warfa put their hands in the air. The man with the gun then pulled Warfa to the ground.
The accomplice went to the back of the store to control a woman who was shopping and an elderly man who had been helping her. When Elmi and Warfa yelled to the woman and the elderly man in the back to call the police, the accomplice demanded in Somali that the man and woman give him their cell phones. The woman lied and said she did not have a cell phone with her. She pleaded with him in Somali, saying “please don’t Mil us, please, I have children at home, I’m a mother, don’t Mil us.” The accomplice then hit the elderly man.
Surveillance footage shows that customer Anwar Mohammed then entered the market. As soon as Mohammed entered *241 and saw the robbery in progress, the man with the gun shot him two times, including once in the head. The accomplice started to yell in Somali, “Don’t kill” or “No killing!” After shooting Mohammed, the man with the gun ran out of the store. Warfa followed him a short distance before returning to the store. The shooter then reappeared and shot Warfa at least twice. Warfa fell, his body holding the door of the market open and the second robber jumped over him and ran out the door. Elmi, who was still inside the store, fumbled for his cell phone after the two robbers left. Before he could complete the call, the shooter returned and chased Elmi through the store. A rack of snacks tipped over and spilled as the two men raced around a corner, before the shooter shot Elmi three times in the back. Surveillance video shows the shooter leaving the store for good at 7:45 p.m., just over a minute after he entered. All three victims died within minutes of being shot.
As soon as the shooting started and the second robber started to flee, the woman and the elderly man in the back of the store ran and hid in the store’s freezer. The woman called 911. She told the 911 operator that there was a robbery at the market, that she had heard gunshots, and that she was in the freezer at the store. She said, “I’m so scared, I’m so scared. I have six children, I don’t want to die.” Two Minneapolis police officers responded to the call. As they drove up to the store, they saw two bodies lying in the entryway of the store. When the officers got out of their squad car, they searched the store for the robbers and found a third victim inside. They also found the woman and the elderly man in the freezer, hiding.
A citizen tipster contacted the police department later that night with potentially relevant information. The tipster told police that when he was visiting a friend two weeks earlier at the Seward Towers West apartment building across the street from the market, he ran into a “kid” he knew from the community center. The kid, the tipster said, was talking about committing a robbery and said he wanted to “look into” the Seward Market because it was also a hawala, or money-wiring center, and would presumably have a lot of cash on hand. Although the tipster did not know the kid’s name, he told police that he often saw the kid around the apartment building and that the kid drove a black Caprice with a broken window that was parked on the second floor of the building’s parking ramp. Minneapolis police sergeants Ann Kjos and Luis Porras, who were assigned to investigate the murders, went to Seward Towers West the night of the murders and found a black Caprice with a broken window. They found out that the parking spot was assigned to apartment 1310, where a woman named Sainab Osman lived with her teenage grandson, Mahdi Ali.
Two days after the murders, on January 8, police received information from another citizen tipster, a high school student. The student said that the day after the murders, a fellow student named Abdisalan Ali (“Abdisalan”) told him that he had been present during the Seward Market murders. The student said Abdisalan claimed to have gone into the store with “a kid named Mahdi,” that Mahdi had a gun, that Abdisalan was at the back of the store with some customers when he heard a gunshot, and that Abdisalan ran out of the store and had to jump over a body on the floor in front of the doorway.
Police arrested Abdisalan just over two hours after the student tipster came to them, believing that Abdisalan was the man who participated in the robbery by controlling the two customers in the back of the store. Although Abdisalan was ini *242 tially not forthcoming, he eventually told police that on the day of the murders, he and his cousin, Ahmed Ali (“Ahmed”), spent time with Ahmed’s friend, Mahdi Ali.[3] Mahdi picked them up from school in a red Crown Victoria, Abdisalan said, and over the course of the next few hours the three teens went to the Minneapolis impound lot and a SuperAmerica before Mahdi dropped Abdisalan off at home around 6:80 or 7:00 p.m.
Based on that information, police found surveillance video from several stores the three teens visited that afternoon. In the videos from the SuperAmerica,- police saw a red Crown Victoria pull up to a gas pump. Someone got out of the passenger seat of the ear and entered the store. Once he entered, police could see a black- and-white striped shirt poking out from underneath his jacket. When he turned and looked at one of the surveillance cameras, police immediately noticed that it was not Abdisalan in the black-and-white shirt. After police saw the video, they believed that the person in the SuperAmerica video was not Abdisalan but was the unidentified accomplice at the back of the Seward Market when the shootings happened. The police then asked Abdisalan more questions about his cousin, Ahmed.
Later that night, police also arrested Mahdi. After the police read him his Miranda rights,[4] Mahdi denied knowing anything about the murders at the Seward Market. As police slowly confronted him with evidence of his activities with Abdisa-lan and Ahmed over the day, Mahdi admitted to going to the gas station and the impound lot with Abdisalan and Ahmed, but he never admitted to playing a role in the murders. Police also searched Mahdi’s apartment that night, and found blue jeans in his closet with blood, from one of the victims, on the cuff.
After police talked to Abdisalan and ruled him out as a suspect, his cousin, Ahmed, turned himself in to police. Once he had an attorney and worked out a deal with the State,[5] Ahmed admitted his role in the murders and verified that he was trying to control the customers in the back of the store when Mahdi started shooting.
From the three men’s statements to police, surveillance videos, and witness testimony, police were able to construct a picture of what happened on the afternoon of the murders. On January 6, Mahdi picked Ahmed and Abdisalan up from school in a red Crown Victoria that Mahdi was borrowing from an acquaintance. They went to a gas station so Mahdi could buy something, and then Mahdi dropped the cousins back off at school because Mahdi had to drive the owner of the car to work. Mahdi returned for the cousins 10 to 15 minutes later. The three teenagers then drove to the Wilson’s Leather coat factory outlet in North Minneapolis, where Abdisalan stole a faux suede Sean John jacket with fur around the collar. He threw the jacket he was wearing before — a big, dark coat with a hood on it — in the car, and put on his new jacket.
Mahdi drove all three of them to the Minneapolis impound lot to retrieve his car, but they left after Mahdi discovered he did not have enough money. After another trip to a gas station, they went to the Dahabshiil money transfer business *243 near the corner of East Franklin Avenue and Nicollet Avenue South. Mahdi, who had since put on the old coat that Abdisa-lan had left in the car, planned to rob the business, although Ahmed later testified that he objected to the plan. Mahdi and Ahmed went into the- money transfer business but eventually left without robbing it. Abdisalan then asked Mahdi and Ahmed to drop him off at home, and they did so.
Mahdi and Ahmed drove back to the neighborhood where Mahdi lived, near the Seward Market. Ahmed later testified that Mahdi started talking about doing “a mission or something.” Mahdi said he knew a place that had “a lot of money,” and that if they robbed it, Mahdi could get enough money to get his car out of the impound lot and then he would give the car to Ahmed. Ahmed testified that he resisted this plan at first, because he had “never done anything like that before,” so he “wasn’t really down with it in the beginning,” but he eventually agreed. Ahmed testified that Mahdi gave him a black ski mask that covered everything but his eyes, while Mahdi used a light blue bandana to cover his face. Before they entered, Mahdi told Ahmed that his job was to “hold anybody that’s in the back,” and “keep them in a place where he can see them.” Ahmed testified that when they got back in the ear after the shootings, he asked Mahdi why he shot those people. He said Mahdi said, “they knew,” meaning that they knew who he was.
On February 4, 2010, a grand jury indicted Mahdi on three counts of premeditated murder in the first degree under Minn.Stat. §§ 609.185(a)(1), 609.11, 609.106, subd. 2(1), 609.05 (2012), for the deaths of Mohammed, Warfa, and Elmi, as well as three counts of felony murder in the first degree while committing or attempting to commit aggravated robbery under Minn.Stat. §§ 609.185(a)(3), 609.11, 609.05. Because the State alleged that Mahdi committed first-degree murder while over the age of 16, Mahdi was automatically certified to stand trial as an adult. See Minn.Stat. §§ 260B.007, subd. 6(b), 260B.101, subd. 2 (2012).
On March 9, 2010, Mahdi moved to dismiss the indictment for lack of jurisdiction. Although Mahdi consistently stated and listed his birth date as January 1, 1993, and obtained a driver’s license before the murders, he said that his real name was Kahlid Farah Arrasi and that he was actually 15 at the time of the crime. If Mahdi was 15 at the time of the murders, the juvenile court would not automatically lose jurisdiction over him. Minn.Stat. §§ 260B.007, subd. 6(b), 260B.101, subd. 2. After, a 3-day age-determination hearing, the district court denied Mahdi’s motion to dismiss for lack of jurisdiction, finding that “the preponderance of the evidence establishes that the Defendant Mahdi Hassan Ali had reached the age of sixteen years before January 6, 2010.” On appeal, we confirmed that when the defendant’s age determines whether the court has jurisdiction, the State has the burden of proving the defendant’s age on the date of the offense by a preponderance of the evidence. State v. Ali, 806 N.W.2d 45, 54 (Minn.2011).
Mahdi’s trial took place over two weeks in September 2011. On September 23, the jury found Mahdi guilty of one count of first-degree premeditated murder, two counts of second-degree murder, and three counts of first-degree felony murder while committing or attempting to commit aggravated robbery. On October 31, 2011, the district court sentenced Mahdi to two life sentences with the possibility of release after 30 years for the first-degree felony murders of Mohammed and Warfa, and a mandatory LWOR sentence for the first-degree premeditated murder of Elmi. *244 Mahdi appealed his conviction to this court, but on September 20, 2012, we granted his motion to stay the appeal to allow Mahdi to pursue postconviction proceedings.
On October 22, 2012, Mahdi petitioned the postconviction court for an evidentiary hearing to renew his challenge to the district court’s jurisdiction, alleging that there was “new evidence establishing that petitioner was 15 years old on the offense date and that the juvenile court therefore had exclusive jurisdiction of his case.” Specifically, Mahdi alleged that he had found his birth certificate, which proved that “Khalid Farah Arase was born to Sainab Said Osman in the Malindi District Hospital on August 25,1994.”[6]
Although the postconviction court granted Mahdi’s request for an evidentiary hearing, it refused to admit the birth certificate into evidence because Mahdi had not established a proper foundation for it.[7] Without the birth certificate, the court concluded that there was no evidence to support Mahdi’s petition and the court denied it. Mahdi filed a motion with this court to vacate the stay of his direct appeal and to consolidate it with an appeal from the postconviction court’s order. We granted that request.
I.
We turn first to Mahdi’s contention that the postconviction court erred in denying his petition for postconviction relief. Mahdi advances three arguments to support his argument that the court erred. First, he argues that the postconviction court improperly excluded his birth certificate as evidence. Second, he argues that the postconviction court improperly relied on the “law of the case” doctrine to assert that our court had already held that the district court had subject matter jurisdiction over Mahdi, so the postconviction court could not reconsider whether it had jurisdiction. Third, he argues that even if the law of the case doctrine were to apply, the postconviction court improperly held that the birth certificate did not fall under the “new evidence” exception to the law of the case doctrine.
With respect to Mahdi’s argument that the postconviction court erred when it determined that the birth certificate was inadmissible, our review is for an abuse of discretion. State v. Brown, 739 N.W.2d 716, 720 (Minn.2007). The postconviction court concluded that the birth certificate was not relevant because Mahdi did not establish that the document at issue was actually Mahdi’s birth certificate. While the postconviction court couched its evi-dentiary ruling in terms of relevance, the focus of the court’s ruling relates to the evidentiary requirement of foundation. Specifically, the court held that the birth certificate was not admissible because Mahdi had not established that the document offered was Mahdi’s birth certificate.
A finding that “the matter in question is what its proponent claims” is a condition precedent to the admissibility of evidence in Minnesota. Minn. R. Evid. 901(a). Foundation can be established in either of two ways: through extrinsic evidence, as *245 contemplated by Minn. R. Evid. 901 (Rule 901); or by a finding that the evidence is “self-authenticating” under Minn. R. Evid. 902 (Rule 902). Because, as discussed below, Mahdi did not establish adequate foundation for the birth certificate, the postconviction court did not abuse its discretion when it determined that the birth certificate was inadmissible.
A.
Under Rule 901, the authenticity of proffered evidence may be established through extrinsic evidence, including “[t]estimony that a matter is what it is claimed to be.” Minn. R. Evid. 901(b)(1). To establish that the birth certificate offered by Mahdi was in fact his birth certificate, Mahdi presented testimony by his mother, who testified that when Mahdi was born, he was named Khalid Farah Arase. She also testified that she was present when Mahdi’s birth certificate was filled out, that it was laminated in plastic when she received it soon after from the issuing authorities, and that she recognized the proffered birth certificate as the birth certificate she was given in the hospital following Mahdi’s birth. Mahdi also relied on earlier testimony by a social worker that in 2005, Mahdi told child protection workers that his name was not Mahdi Ali. Mahdi reportedly used a number of different names during his interactions with child protection workers, including “Khalid Arrasi.”
The postconviction court determined that Mahdi failed to present any credible evidence tying him to the proffered birth certificate. The court explained that the testimony of Mahdi’s mother was “contradicted by the physical condition of the paper document which indicates it must have been laminated long after being issued.” The court also questioned her ability to identify the birth certificate when she was unable to read or write. Moreover, the court made a specific finding that Mahdi’s mother was “not a credible witness.” With regard to Mahdi’s earlier use of the name Khalid Farah Arrasi, the court found that the name on the birth certificate was spelled differently and there were no “fingerprints, footprints or other biometrics” to tie the birth certificate to Mahdi.
On appeal, Mahdi challenges the post-conviction court’s conclusion that he failed to present any credible evidence tying him to the birth certificate. Specifically, Mahdi argues that there was “ample evidence that the birth certificate was for [Mahdi],” including the evidence that Mahdi told child protection workers as early as 2005 that his name was not Mahdi Ali. We are not persuaded.
We review a postconviction court’s credibility determinations under the clearly erroneous standard. See Tscheu v. State, 829 N.W.2d 400, 403 (Minn.2013). In order for a credibility determination to be clearly erroneous, we must “be left with the definite and firm conviction that a mistake has been made.” State v. Evans, 756 N.W.2d 854, 870 (Minn.2008) (citation omitted) (internal quotations marks omitted). This standard creates a “high threshold.” State v. Williams, 842 N.W.2d 308, 313 (Minn.2014).
Based on our review of the record, we conclude that Mahdi has not demonstrated that the postconviction court’s finding that he failed to present any credible evidence tying him to the proffered birth certificate was clearly erroneous. There is reasonable evidence to support the court’s finding, including the physical evidence contradicting the testimony of Mahdi’s mother, the different spelling of the name on the birth certificate, and the lack of any fingerprints, footprints, or other biometrics tying *246 the birth certificate to Mahdi. Consequently, we hold that the postconviction court did not abuse its discretion when it determined that the birth certificate was not admissible under Rule 901.
B.
The fact that Mahdi failed to establish sufficient foundation for the birth certificate under Rule 901 is not dispositive of the foundation issue, however, because Rule 902 allows a court to admit “self-authenticating” documents without any extrinsic evidence of authenticity. Domestic public documents are self-authenticating if they bear one of the enumerated official seals and a signature purporting to be an attestation or execution. Minn. R. Evid. 902(1). Foreign public documents are not self-authenticating unless they satisfy an additional requirement, specifically “a final certification as to the genuineness of the signature and official position ... of the executing or attesting person.”[8] Minn. R. Evid. 902(3). Rule 902(3) provides a list of persons who may make a final certification of genuineness, including “a diplomatic or consular official of the foreign country assigned or accredited to the United States.” Id.
The birth certificate offered by Mahdi bore a seal and a signature purporting to be an attestation or execution by the Malindi District Registrar.[9] And defense counsel submitted an unsigned letter from the Kenyan Embassy in Washington, D.C., stating that the birth certificate “bears the Seal of the Registrar of Births and Deaths of the Republic of Kenya.” The letter did not identify the name or position of the person at the embassy who reviewed the birth certificate.
The postconviction court concluded that Mahdi failed to satisfy the final certification requirement of Rule 902(3)(A), because the letter was unsigned and did not identify the name or position of the person who reviewed the birth certificate.[10] The court also noted that the seal on the back of the birth certificate did not certify that the signature on the document was made by someone authorized to execute the document.
On appeal, Mahdi argues that the post-conviction court abused its discretion when it determined that the birth certificate was not self-certifying. More specifically, he contends that he satisfied Rule 902(3) by “presenting] information to the court of a *247 Kenyan birth certificate that was issued by the Registrar of Births and Deaths of the Republic of Kenya, as certified by a specific Kenyan Embassy official who reviewed and authenticated the document.” Although defense counsel seems to have done her utmost to get the embassy to provide the information she needed, the record supports the court’s determination that Mahdi failed to establish the name and position of the person who reviewed the birth certificate at the embassy. Moreover, even if Mahdi had established the name and position of the person who reviewed the birth certificate, the certification letter still fails to satisfy the requirements of Rule 902(B) because it attests to the genuineness only of the seal of the Registrar of Births and Deaths of the Republic of Kenya, not the genuineness of the signature and official position of the Mal-indi District Registrar.
In sum, the record supports the postcon-viction court’s determinations that Mahdi failed to satisfy the requirements of Rules 901 and 902(8). Consequently, the post-conviction district court did not abuse its discretion when it determined that the proffered birth certificate was inadmissible.[11] Without the birth certificate, Mahdi has no support for his contention that he is entitled to postconviction relief. Accordingly, we hold that the postconviction court did not err in denying Mahdi’s petition.
II.
We next turn to Mahdi’s argument that the district court abused its discretion by allowing two different types of opinion testimony relating to the surveillance videos. First, Mahdi argues that the court erred by permitting police to testify that, based on their review of some of the videos, they eliminated Abdisalan as one of the two assailants who entered the Seward Market, and they determined that Ahmed was the shooter’s accomplice. Second, he argues the court erred by allowing testimony by the forensic experts who digitally clarified the surveillance videos to testify about the similarities between clothing, build, skin tone, and shoes of the people in the surveillance videos. In both instances, Mahdi contends the testimony was inadmissible because it failed to meet the helpful-to-the-trier-of-fact requirements of Minn. R. Evid. 701 (Rule 701) and 702 (Rule 702).[12] We consider the disputed testimony separately.
A.
When police were investigating the Seward Market murders, they relied heavily on surveillance footage from a vari *248 ety of businesses to help build a timeline for the robbers’ activities that day. Police used video from the impound lot, a Super-America, a money transfer business, a hospital, and importantly, the Seward Market to help construct what happened.
Before trial, Mahdi filed a motion to exclude opinion testimony by law enforcement officers “as to [the] identification of the defendant on surveillance video.” The district court granted Mahdi’s motion in part, ruling that the State could not ask the officers if they currently had an opinion as to whether the person in the surveillance videos was Mahdi. Nevertheless, the court concluded that “with the appropriate foundation” the police officers should be allowed to testify about the conclusions they drew during the investigation period after watching the surveillance video for the limited purposes of explaining (1) “why the police focused on [Mahdi],” and (2) “why the investigation proceeded as it did.” To ensure the limited use of such testimony, the court indicated that it would be “willing to give a limiting instruction” to the jury “to draw its own conclusion as to whether the person in the video tape is in fact the defendant.”
At Mahdi’s trial, Sergeant Ann Kjos testified that after police saw the SuperAmer-ica video, they identified the man in the video as the shooter’s accomplice:
Q: Did you have an opinion as to whether the person in the video, then in the SuperAmerica that’s just been admitted, was involved in the Seward Market shootings?
A: Yes.
Q: What was that opinion?
Def: Objection, Your Honor, 701, 702.
Q: Sergeant, limit your testimony to what you thought at the time you viewed the video and what conclusions you drew then and then only.
A: At that time when I saw the gentleman from .the SuperAmerica, I at that time, I believed that he was the person that had entered the store, the Seward Market, and had gone to the back of the store to control the customers.
Sergeant Kjos next said that police eliminated Abdisalan, Ahmed’s cousin, as the shooter’s accomplice after viewing video from the impound lot and the SuperAmeri-ca.
Q: Did you eventually take Abdisalan home?
A: I did.
Q: Why did you take him home?
A: After seeing the video from both the SuperAmerica and the impound lot, I believed at that time that Ab-disalan was not one of the two people — was not either of the two people that had entered the Seward Market with the intention of robbing them and eventually lolling three men.
After defense counsel objected, the district court issued the following jury instruction:
Court: Members of the jury, any statement made by the witness regarding the state of mind of other people is to be disregarded by you. In addition, the Sergeant’s conclusions regarding who’s depicted in various videos are to put the investigation of this case into context. You are to draw your own conclusions based on all the evidence on who might be in any of the videotapes that are in evidence at this time.
On appeal, Mahdi argues that the district court erred by allowing this testimony because it is not admissible under Rule 701 or 702, and that the district *249 court’s assertion that it would “help the jury understand why police focused on appellant” was not accurate considering the course of the investigation. The State, however, argues that Sergeant Kjos’s testimony was properly admitted to provide context for the police investigation. Evi-dentiary rulings rest within the sound discretion of the district court, and we will not reverse an evidentiary ruling absent a clear abuse of discretion. State v. Medal-Mendoza, 718 N.W.2d 910, 917 (Minn.2006).
We have made clear that evidence is generally admissible to give jurors the context for an investigation. State v. Griller, 583 N.W.2d 736, 743 (Minn.1998). In Griller, we considered the appeal of a man convicted of murdering someone and then burying the victim in his backyard in northeast Minneapolis. Id. at 738-39. We held that the district court did not abuse its discretion in admitting testimony about a letter sent to the Sioux Falls Police Department that started the investigation or the content of police interviews with neighbors. Id. at 743. The testimony “provided the jury with the context necessary to explain how the investigation against Griller began and why the police were excavating [Griller’s] backyard.” Id.; see also State v. Czech, 343 N.W.2d 854, 856 (Minn.1984) (affirming the admission of evidence of an undercover investigation of the defendant because the evidence could show “the context of the conversation; that is, why the undercover agents were talking with defendant”).
Mahdi argues that the district court’s rationale that the police testimony “would help the jury understand why police focused on appellant,” was “not consistent with the facts” because police received the first citizen tip within hours of the shootings that led them to Mahdi’s car in the Seward Towers West parking ramp. By the time police saw the videos, he argues, they had already identified Mahdi as a suspect “and gathered sufficient probable cause to arrest him and obtain a magistrate-approved search warrant.” Mahdi’s argument suggests that evidence is admissible to show the context of an investigation only when it is evidence that first made police suspect that the defendant may have been involved in a crime. But our cases do not draw such a fine distinction on how the information must have affected the investigation.
As the State notes, the evidence from police was important context evidence in this case considering that Mahdi’s defense was centered on the contention that he had been misidentified and someone else shot the three men at the Seward Market. Mahdi’s attorney began his opening statement by saying: “Misidentification. That’s what this case is about.” He similarly began his closing statement by saying, “Misidentification. That’s what I told you this case would be about last Monday, and that’s what we’ve seen.” Without police being able to testify as to why they ruled out Abdisalan, a possible alternate perpetrator, the jury might have wondered why police did not further investigate Ab-disalan and why police decided to focus the investigation on Mahdi as the possible shooter in the Seward Market.
Importantly, the district court gave a limiting instruction to make sure the jury did not improperly rely on the evidence. The court reminded the jury that “the Sergeant’s conclusions regarding who’s depicted in various videos are to put the investigation of this case into context,” and that the jury is supposed to “draw [its] own conclusions based on all the evidence on who might be in any of the videotapes that are in evidence at this time.” Jurors are presumed to follow limiting instructions with respect to the proper use of *250 evidence, and Mahdi has not provided any reason to doubt that the jurors followed the instructions here. See State v. Fardan, 773 N.W.2d 303, 320 (Minn.2009). We hold that in the context of the trial, the district court did not abuse its discretion in allowing Sergeant Kjos to testify that once she and her partner viewed the surveillance videos, they eliminated Abdisalan as one of the two assailants who entered the market and determined that Ahmed was the accomplice at the Seward Market who did not have a gun.[13]
B.
Before trial, Mahdi also filed a motion to exclude the testimony of two forensic experts who worked for Target Corporation when police were investigating the murders. Target has an accredited crime laboratory. The lab was created to investigate the company’s problems with organized retail crime, but it also does pro bono work for local law enforcement. Minneapolis police detectives asked the lab to help investigate the Seward Market shootings by examining surveillance footage. Mahdi argued that the testimony at issue was not admissible as expert testimony under Rule 702 because it was not “helpful” to the jury. Specifically, Mahdi argued that “the jury is in as good a position to look at the photographs and draw conclusions from them as Target Forensics, [and so] the testimony of the Target Forensic witnesses would be of little assistance to the jury and should not be admitted.”
At a pretrial motion hearing, the district court denied Mahdi’s motion to exclude the testimony of the forensic experts. Noting that some of the surveillance videos “were digitally manipulated to clarify details in the tape,” the court said it was “necessary that the digital evidence technicians testify to say what was done and how it affects the accuracy of the image that is portrayed.” The court said it was “appropriate that they testify and be able to point out similarities between clothing, build, skin tone, shoes,” and that the experts were “also under the obligation to testify that those similarities are not caused by the digital clarification process.” The court also noted that if some differences in the tapes are “explainable by factors other [than] the items or persons being different items,” the experts should be “allowed to explain why.”
For example, the court said:
[T]he lighting, the aspect ratio, whatever goes into their opinion about why it might appear differently. That generally is not within the province of the normal juror as to how lighting and other factors on a video tape could affect the appearance of items from one video tape to the next.
The court also placed limits on the Target forensic experts’ testimony:
These witnesses may not ... testify that they are in fact the same clothing or the same persons. They can point out similarities. They can say why they are similar and whether it was caused by their digital manipulation of the evi *251 dence or not. They may point out differences and explain why they appear to be different. They may not offer opinion that they are in fact the same clothing or same person’s [sic] depicted in the various video tapes.
Target forensic expert Jimmy Schoering testified on September 15, 2011. He told the jury that he “performed enhancements to the images that [he] extracted” from videos from the impound lot, the Super-America, the Dahabshiil check cashing facility, and the Seward Market. He said he compared the shooter in the Seward Market videos to people appearing in the videos from the other three locations.
Schoering pointed out several similarities between the person identified as Mahdi Ali[14] in various photos from the impound lot and the Dahabshiil check cashing center, including cuffs in the jeans, the color of his shoes, his skin tone, and his “general build.” Schoering testified that the person identified as Mahdi Ali in the impound lot video “could not be eliminated as being the same as the individual holding the weapon in the Seward Market.” But he also said that despite the fact that the person later identified as Ahmed Ali had “no significant characteristics other than general skin tone” in common with the shooter in the Seward Market video, Ahmed “also could not be eliminated as being the same as the individual with the weapon in the Seward Market.” He also testified that the person later identified as Mahdi Ali in the video from the Dahabshiil check cashing center had “similar build, similar general skin tone ... shoes, and the cuffing on the jeans” in common with the Seward Market shooter. Schoering testified that the person identified as Mahdi Ali in the Dahabshiil video “could not be eliminated as being the same as the individual holding the weapon in the Seward Market.” Schoering also testified at length about how variations in video quality and lighting could cause variations in the images that the jury saw.
The second Target forensic expert to testify was Jacob Steinhour. Steinhour was asked to compare pictures of pants that the Minneapolis police recovered at Mahdi Ali’s apartment with the images of pants that were recorded in the various surveillance videos. Steinhour pointed out various details in the pants that were apparent in the surveillance videos, such as contrast in the fabric on one of the thighs. In the end, Steinhour testified that he could not conclude whether the pants matched.
On appeal, Mahdi argues that the testimony of the Target analysts was inadmissible under Rule 702. He does not challenge the portion of the testimony from the analysts about how they extracted video and used technology to clarify some of the images. Rather, he argues that the district court improperly admitted “testimony comparing the gunman to a specific individual in the other videos and comparing the cuffed jeans to jeans worn by the gunman and in the other videos.”
Rule 702 provides that “[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.” Expert testi *252 mony is “only admissible if the testimony will help the trier of fact in evaluating evidence or resolving factual issues.”. State v. Medal-Mendoza, 718 N.W.2d 910, 917 (Minn.2006).
Mahdi cites a variety of federal cases that affirmed the exclusion of similar testimony on the basis that it would not be “helpful” to the jury and therefore was not the proper subject of expert opinion testimony. See, e.g., United States v. Dorsey, 45 F.3d 809, 812-15 (4th Cir.1995) (affirming a trial court’s decision to exclude the testimony of two experts who were going to say that the defendant was not the individual depicted in bank surveillance photographs because it would not be helpful to the jury); United States v. Brewer, 788 F.2d 841, 842 (9th Cir.1986) (affirming a trial court’s decision to exclude testimony from an expert that the defendant was not the robber depicted in surveillance photographs). But these cases do not categorically hold that the evidence would not actually help the jury, only that the trial courts in these cases did not abuse their discretion in concluding that the evidence would not help the jury. See Dorsey, 45 F.3d at 812 (“We find that under an abuse of discretion standard, the district court did not err.”); Brewer, 783 F.2d at 842 (“[T]he trial court’s ruling on this evidence was not manifestly unreasonable. . . .”).
Here, the district court concluded that the testimony would assist the jury because the videos reflected “similarities between clothing, build, skin tone, shoes,” and the experts had an “obligation to testify that those similarities are not caused by the digital clarification process.” Although some of.these similarities are readily apparent from watching the surveillance videos, our review of the videos confirms that some of the finer details required expertise and were not within the knowledge of an average juror. For example, one of the Target analysts testified that by using the camera angle and distance from the camera, it is possible to tell that one suspect is taller than the other, The district court determined this sort of testimony would help the jury, and we hold that the court did not abuse its discretion in reaching that determination.[15]
III.
We turn next to Mahdi’s contention that the mandatory imposition of a sentence of life without the possibility of release (LWOR) for his first-degree premeditated murder conviction violated the Eighth Amendment to the U.S. Constitution because it constitutes cruel and unusual punishment. Mahdi’s argument is based on Miller v. Alabama, in which the Supreme Court held that, as applied to juveniles, sentencing schemes mandating LWOR violate the Eighth Amendment’s prohibition on cruel and unusual punishment. — U.S. -, 132 S.Ct. 2455, 2460, 183 L.Ed.2d 407 (2012). The Court did not categorically prohibit LWOR sentences but rather required that before imposing such sentences, “a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles.” Id. at -, 132 S.Ct. at 2475. Among the factors to be considered are the juvenile’s “immaturity, impetuosity, and failure to appreciate risks and consequences.” Id. at -, 132 S.Ct. at 2468.
Mahdi’s 2011 conviction for premeditated murder in the first degree un *253 der Minn.Stat. § 609.185(a)(1) (2012) carries a mandatory LWOR sentence under Minnesota’s “heinous crimes” statute.[16] See Minn.Stat. § 609.106, subd. 2(1) (2012). Mahdi argues that under Miller, the mandatory imposition of a LWOR sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment to the U.S. Constitution. See U.S. Const, amend. VIII. The State concedes that in Mahdi’s case, the mandatory imposition of a LWOR sentence violates the Eighth Amendment under Miller. We agree with the parties.
We have held that Miller is a new rule of constitutional criminal procedure. Chambers v. State, 831 N.W.2d 311, 326-28 (Minn.2013). Such rules apply to cases pending on direct review at the time the new rule is announced. State v. Osborne, 715 N.W.2d 436, 441 (Minn.2006). Because Mahdi’s conviction was not yet final on direct review when Miller was decided, Miller applies to Mahdi’s case. See Teague v. Lane, 489 U.S. 288, 300-10, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). We therefore reverse the mandatory imposition of the LWOR sentence imposed on Mahdi for his first-degree premeditated murder conviction.
A.
The parties agree that the sentence was unconstitutional, but they disagree as to how to proceed with sentencing on the first-degree premeditated murder conviction. The State argues that State v. Chauvin, 723 N.W.2d 20 (Minn.2006), makes clear that, in the absence of legislative action, district courts have the inherent judicial authority to conduct a judicial proceeding that is necessary to preserve the constitutionality of a legislative sentencing scheme, and therefore we should remand to the district court for resentencing following a Miller hearing. Mahdi contends that Miller requires us to declare the 2005 amendment to Minn.Stat. § 609.106 (adding premeditated murder to the list of offenses that mandate the imposition of a LWOR sentence)[17] unconstitutional, and revive the most recent version of the legislature’s sentencing scheme that passes constitutional muster in accordance with Fedziuk v. Commissioner of Public Safety, 696 N.W.2d 340 (Minn.2005). According to Mahdi, the most recent sentencing scheme to pass constitutional muster requires us to resentence him to life with the possibility of release after 30 years. See Minn.Stat. §§ 244.05, subd. 4, 609.106, 609.185 (2004).
Whether the remedy in this ease is controlled by Chauvin or Fedziuk presents a question of law that is informed by review of the several principles that help to define a district court’s authority in the sentencing arena. First, the Legislature has the power to define the punishment for crimes (including the terms of confinement and parole), and the courts are the executor of that legislative power. State v. Osterloh, 275 N.W.2d 578, 580 (Minn.1978) (citing State ex rel. Ahern v. Young, 273 Minn. 240, 243, 141 N.W.2d 15, 17 (1966)). Second, the separation of powers doctrine requires that “ ‘[¡judicial sentencing must strictly adhere to statutory authorization.’ ” State v. Mitchell, 577 *254 N.W.2d 481, 493 (Minn.1998) (quoting State v. Jonason, 292 N.W.2d 730, 733 (Minn.1980)). Third, a court has inherent judicial authority to engage in activities that are necessary to the performance of judicial functions, but “the judiciary is not to resort to inherent authority when doing so would not ‘respect the equally unique authority of another branch of government.” State v. M.D.T., 831 N.W.2d 276, 280, 282 (Minn.2013) (quoting State v. C.A., 304 N.W.2d 353, 359 (Minn.1981)). Keeping these principles in mind, we consider whether Chauvin or Fedziuk controls the remedy in this ease.
In Chauvin, the State charged the defendant with felony theft by swindle and provided him with notice that it intended to seek an enhanced sentence under Minn. Sent. Guidelines II.D.2b.(1). Chauvin, 723 N.W.2d at 22. After the defendant was charged, but before his trial, the U.S. Supreme Court decided Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), which rendered unconstitutional the provisions of the Minnesota Sentencing Guidelines that allowed for judicial fact-finding of aggravating sentencing factors. See Chauvin, 723 N.W.2d at 22. In an effort to comply with the rule announced in Blakely, the district court empaneled a Blakely jury after the jury had found the defendant guilty. Id. at 23. Based on the Blakely jury’s findings of fact, the district court imposed an upward durational sentencing departure. Id.
On appeal, the defendant in Chauvin challenged the district-court’s authority to empanel a Blakely jury. We concluded that the district court was permitted to empanel a sentencing jury because courts have the inherent judicial authority to engage in activities that are necessary to the performance of judicial functions and the exercise of that authority in the context presented in Chauvin “did not infringe on” legislative or executive functions. Chauvin, 723 N.W.2d at 25-27. We explained that it was “practically necessary” for the district court to improvise a jury fact-finding mechanism because the new rule of criminal procedure announced in Blakely left the district court without a constitutional statutory mechanism to impose the aggravated sentence that the Legislature intended. Id. at 25. Put differently, the district court could either “completely ignore the legislative scheme for departing from the presumptive guideline sentence,” or “it could do the least amount of damage to the statutory scheme by retaining the departure mechanism while at the same time complying with Blakely by using a sentencing jury.” Id.
We said the district court was right to choose the second option. We also explained that impaneling a Blakely jury was a uniquely judicial function because it was a procedural matter. Id. We emphasized that “Blakely did not remove the ability of a judge to impose an aggravated sentence, it only changed the process by which aggravated sentences may be imposed.” Id. Finally, we explained that the district court had not infringed on the legislative function of creating a sentencing guideline system because “there was no new legislation providing for the same or a different procedure” and “[f]ar from infringing on a legislative function, the district court was effectuating the legislative policy of allowing the opportunity to depart from the presumptive sentence where ‘substantial and compelling circumstances exist.’” Id. at 27 (quoting Minn. Sent. Guidelines 1.4, II.D.) Consequently, we held in Chauvin that when a sentencing scheme set out by the Legislature has been ruled unconstitutional and the Legislature has remained silent on how to fix it, district courts have inherent power to adopt judicial procedures that can bring the sentencing scheme into compliance with the new rule *255 of constitutional criminal procedure while doing “the least amount of damage to the statutory scheme.” Id. at 25.
Unlike Chauvin, Fedziuk, 696 N.W.2d 340, did not involve a sentencing scheme that failed to comply with a new rule of constitutional criminal procedure.[18] Instead, Fedziuk involved two certified questions relating to several amendments to the implied consent law. 696 N.W.2d at 342. We held in Fedziuk that the implied consent law, as amended in 2003, offended a driver’s constitutional right to procedural due process because the administrative review procedures provided by the executive branch, “although prompt, [did] not provide a sufficiently meaningful review.” Fedziuk, 696 N.W.2d at 347. We went on to explain that when a statute is unconstitutional, it is “not a law and it is as inoperative as if it had never been enacted.” Id. at 349. Nevertheless, “only the latest amendment is severed and any previous version found constitutional remains in full force and effect,” because an unconstitutional law, “being void and inoperative, cannot repeal or in any way affect an existing one.” Id. We then revived the version of the statute that was in effect immediately prior to the unconstitutional amendments. Id.
The remedy we sanctioned in Chauvin provides a better fit for the circumstances presented here than the remedy we used in Fedziuk.[19] As in Chauvin, *256 we are faced with a sentencing scheme that does not comply with the new rule of constitutional criminal procedure announced in Miller and the Legislature has remained silent on how to fix it. Consequently, we have two options. We could completely ignore the existing legislative sentencing scheme, which reflects a policy judgment that first-degree premeditated murder warrants a sentence of LWOR. See Minn.Stat. § 609.106, subd. 2. In the alternative, we could “do the least amount of damage to the statutory scheme” by remanding to the district court for resen-tencing following a Miller hearing at which the court would consider among other factors, Mahdi’s age and his family and home environment. We conclude as we did in Chauvin that the second option is the most sensible choice. Assessing what, if any, impact a defendant’s age and family environment should have on the sentence in a particular case is a uniquely judicial function. State v. Misquadace, 644 N.W.2d 65, 68 (Minn.2002) (the imposition of a sentence within the limits prescribed by the Legislature is purely a judicial function); State v. Heywood, 338 N.W.2d 243, 244 (Minn.1983) (explaining that a defendant’s age and family support are relevant sentencing factors). And remanding for a Miller hearing will not infringe on the Legislature’s unique power to define the punishment for crimes because there is no legislation post-Miller providing for the same or a different procedure.[20] In fact, allowing the district court to hold a Miller hearing -will “effectuat[e] the legislative policy” to the extent the heinous-crimes statute reflects a legislative preference for LWOR sentences for heinous crimes. Chauvin, 723 N.W.2d at 27. This is so because in the absence of mitigating circumstances, the Legislature’s prescribed sentence of life without the possibility of release remains unaltered. We, therefore, remand to the district court with instructions to vacate the LWOR sentence and then resentence Mahdi on the first-degree premeditated murder conviction following a Miller hearing.[21]
B.
Because we are remanding for a Miller hearing, we turn now to a discussion of some of the parameters for such a hearing for Mahdi and any other juveniles who are sentenced before the Legislature addresses Miller’s impact on the sentencing scheme in the heinous-crimes statute. In Miller, the Court held that “a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles.” — U.S. at -, 132 S.Ct. at 2475. The Miller Court suggested that mitigat *257 ing circumstances might include, but are not limited to, the defendant’s “chronological age and its hallmark features — among them, immaturity, impetuosity, and failure to appreciate risks and consequences.... the family and home environment that surrounds him — and from which he cannot usually extricate himself — no matter how brutal or dysfunctional_ [and] the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him.” Miller, — U.S. at -, 132 S.Ct. at 2468. These factors, while not exclusive, establish a useful starting point.
In addition, the purpose of a Miller hearing is to provide the sentencer an opportunity to consider any mitigating circumstances that would demonstrate that the imposition of a sentence of LWOR is not appropriate. To that end, the district court should, upon request and with the assistance of counsel, hold an evidentiary hearing at which the juvenile may present evidence to establish the existence of any mitigating circumstances.
If on remand the district court here concludes that the circumstances established at Mahdi’s Miller hearing do not warrant a possibility of release, the court should reimpose a sentence of LWOR in accordance with Minn.Stat. § 609.106. If, on the other hand, the court concludes that the circumstances established at the Miller hearing warrant a possibility of release, the court should impose a sentence of imprisonment for life in accordance with Minn.Stat. § 609.185(a), in which case Mahdi will be eligible to seek supervised release under Minn.Stat. § 244.05 after he serves a minimum term of 30 years.
IV.
We turn next to Mahdi’s argument that he should be resentenced because his entire sentence violates the Eighth Amendment to the U.S. Constitution and Article I, Section 5 of the Minnesota Constitution. Mahdi argues that because his consecutive sentences are the “practical equivalent” of LWOR, the aggregate sentence is unconstitutional. Whether a criminal sentence violates the constitution is a question of law that we review de novo. State v. Gutierrez, 667 N.W.2d 426, 438 (Minn.2003).[22]
A.
Mahdi argues that although Miller did not address the imposition of lengthy aggregate sentences, the district court’s decision to impose consecutive life sentences was the equivalent of imposing a sentence that “from the outset denied [him] the possibility of ever being released from prison.”[23] Therefore, he argues, the “entire sentence was the practical equiva *258 lent of the type of sentence that Miller held violated the Eighth Amendment[.]” The State, however, contends that Miller does not address the imposition of discretionary consecutive sentences, and that the district court had an opportunity to consider mitigating circumstances before imposing Mahdi’s sentence. We agree with the State.
Mahdi’s argument fails to recognize that the mandatory imposition of an LWOR sentence was the crucial factor in Miller. Miller, — U.S. at -, 132 S.Ct. at 2466. In Miller, the Court said that the fact that the sentences are mandatory “prevent[s] the sentencer from taking account of these central considerations.” Id. Removing youth from the balance prohibits a sentencing authority “from assessing whether the law’s harshest term of imprisonment proportionately punishes a juvenile offender.” Id. at -, 132 S.Ct. at 2466. The Court specifically did not foreclose the punishment of LWOR for juveniles, but required that such sentences not be imposed without taking the defendants’ youth into consideration. Id. at -, 132 S.Ct. at 2469 (“Although we do not foreclose a sentencer’s ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.”).
The decision to impose concurrent or consecutive sentences falls within the discretion of the district court. Minn.Stat. § 609.15 (2012); see State v. Warren, 592 N.W.2d 440, 451 (Minn.1999) (“Sentencing is within the discretion of the trial court absent an abuse of discretion.”); Minn. Sent. Guidelines 2.F.2.a.(1)(ii) (providing that it is permissible for district court judges to sentence those convicted of first-degree murder to consecutive sentences). In Mahdi’s case, the district court exercised its discretion to sentence Mahdi to consecutive life sentences; after considering all the aggravating and mitigating circumstances specific to his crimes. Because the imposition of consecutive sentences was not mandatory, but was discretionary, Mahdi’s reliance on Miller is misplaced. We therefore hold that the district court’s imposition of consecutive sentences for the two first-degree felony murder convictions is not cruel and unusual punishment under the U.S. Constitution.
B.
Mahdi also argues that the imposition of consecutive life sentences violates Article I, Section 5 of the Minnesota Constitution. We disagree.
The Minnesota Constitution contains a provision that is almost identical to the Eighth Amendment, but it prohibits “cruel or unusual” punishments instead of “cruel and unusual” punishments. Compare Minn. Const. art. I, § 5 (emphasis added), with U.S. Const. amend. VIII (emphasis added). We have held that this difference in wording is “not trivial” because the “ ‘United States Supreme Court has upheld punishments that, although they may be cruel, are not unusual.’ ” State v. Vang, 847 N.W.2d 248, 263 (Minn.2014) (quoting State v. Mitchell, 577 N.W.2d 481, 488 (Minn.1998)). In determining whether a particular sentence is cruel or unusual under the Minnesota Constitution, courts should separately examine whether the sentence is cruel and whether it is unusual. State v. Juarez, 837 N.W.2d 473, 482 (Minn.2013). Someone challenging a sentence as cruel or unusual bears the “heavy burden ... of showing that our culture and laws emphatically and well nigh universally reject the sentence.” State v. Chambers, 589 N.W.2d 466, 479 (Minn. *259 1999) (citation omitted) (internal quotation marks omitted).
To determine whether a sentence is cruel, a court should compare the gravity of the offense to the severity of the sentence. See Mitchell, 577 N.W.2d at 489 (noting that this step of the analysis is consistent with the first step of the case-by-case analysis for the Eighth Amendment). Mahdi has made no showing that the imposition of consecutive sentences was disproportionate considering the gravity of the offenses the jury found that he committed. Therefore, Mahdi has not shown that the sentence is “cruel” under Article I, Section 5 of the Minnesota Constitution.
To determine whether a sentence is unusual, a court should compare the defendant’s sentence with sentences received by other offenders convicted of the same or similar offenses both inside and outside of Minnesota. See Juarez, 837 N.W.2d at 482. Here, too, Mahdi’s claim fails. We have repeatedly affirmed consecutive life sentences for juveniles for the kinds of crimes that Mahdi committed. See, e.g., State v. Flowers, 788 N.W.2d 120, 122 (Minn.2010) (affirming two consecutive life sentences for a 16-year-old who murdered two people while trying to rob a house); State v. Warren, 592 N.W.2d 440, 452 (Minn.1999) (holding. that a district court abused its discretion in imposing concurrent sentences on a defendant who shot and killed three victims); State v. Ouk, 516 N.W.2d 180, 186 (Minn.1994) (affirming consecutive sentences for a 15-year-old who shot and killed two people at close range); State v. Brom, 463 N.W.2d 758, 765 (Minn.1990) (affirming consecutive life sentences for a 16-year-old who murdered his parents and siblings with an ax). Mahdi has also made no showing that such sentences are “unusual” in other states. Therefore, we hold that the district court’s imposition of consecutive life sentences did not violate Article I, Section 5 of the Minnesota Constitution.
C.
Mahdi next argues that the district court abused its discretion in imposing consecutive sentences. First, he argues that the court failed to recognize that “juveniles differ from adults for sentencing purposes and are less deserving of the harshest punishments because they have diminished culpability and heightened prospects for reform.” Second, he argues that the district court abused its discretion because it imposed consecutive sentences with the express purpose of preventing Mahdi from ever being released from prison. The State, on the other hand, argues that the court’s discretionary imposition of consecutive life sentences for Mahdi’s convictions for multiple murders is not excessive, noting that Mahdi’s case is one of those “uncommon or rare crimes for which the most severe punishment should be reserved.”
A district court’s decision to impose consecutive sentences is reviewed for an abuse of discretion. State v. McLaughlin, 725 N.W.2d 703, 715 (Minn.2007). We will interfere with a district court’s sentencing discretion only when the sentence is disproportionate to the offense or it unfairly exaggerates the criminality of the defendant’s conduct. State v. Fardan, 773 N.W.2d 303, 322 (Minn.2009). In cases with multiple victims, consecutive sentences are rarely, if ever, disproportionate to the offense. In McLaughlin, for example, we upheld the imposition of two consecutive life sentences for a student who shot and killed two of his classmates when he was 15. 725 N.W.2d at 715-16. McLaughlin argued that the district court abused its discretion by imposing consecutive sentences because the court failed to *260 give sufficient weight to several factors related to his culpability, including his youth. Id. at 715. In rejecting his challenge, we noted that “youth” was a factor in numerous cases in which we had upheld comparable sentencing, especially those involving “particularly callous murders.” Id. at 716; see also Warren, 592 N.W.2d at 452 (holding that a district court abused its discretion in imposing concurrent sentences on a defendant for three murders); Ouk, 516 N.W.2d at 186 (affirming consecutive sentences for a 15-year-old who shot and killed two people at close range); Brom, 463 N.W.2d at 765 (affirming consecutive life sentences for a 16-year-old who murdered his parents and siblings with an ax).
Like the defendants in McLaughlin, Ouk, Brom, and Warren, Mahdi is convicted of “particularly callous murders.” See McLaughlin, 725 N.W.2d at 716. The defense acknowledges that because of the age-determination hearing, the district court “had an abundance of information about appellant’s unique personal circumstances,” and the defense also urged the court at sentencing to consider Mahdi’s youthful characteristics. Nonetheless, the court recognized the singular brutality with which Mahdi carried out the crimes and made clear that Mahdi should never be released from prison. See Warren, 592 N.W.2d at 452 (noting that the district court should have considered “severe aggravating factors” when determining whether the sentence should be consecutive or concurrent). We hold that the district court did not abuse its discretion by imposing consecutive sentences on Mahdi.
V.
Mahdi also raises a series of pro se arguments in a supplemental brief. We consider each of them in turn.
Mahdi first argues that he received ineffective assistance of counsel. Specifically, he argues that his attorney should have requested a change of venue and that he should have introduced evidence of an alternative perpetrator. These claims fail because they raise matters of trial strategy, which we will not review. Leake v. State, 737 N.W.2d 531, 536 (Minn.2007). Moreover, even if these two matters did not constitute trial strategy, Mahdi has not shown that his counsel’s decision on these two matters was objectively unreasonable. State v. Lahue, 585 N.W.2d 785, 789 (Minn.1998) (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)) (noting that to prevail on an ineffective assistance of counsel claim, an appellant must show that trial counsel’s representation “fell below an objective standard of reasonableness, and that a reasonable probability exists that the outcome would have been different but for counsel’s errors”).
Mahdi separately argues that his counsel was ineffective because he did not challenge the prosecutor’s claims of finding blood on Mahdi’s pants and did not maintain Mahdi’s innocence during the opening and closing statements. These claims fail for lack of factual support.
Based on our careful review of the record, we hold that Mahdi has not shown that his counsel was ineffective.[24]
Mahdi also argues that his Miranda waiver was not knowing, voluntary and intelligent. See Miranda v. Arizona, 384 *261 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). But we will not decide issues that were not raised before the district court, even when criminal defendants raise constitutional claims for the first time on appeal. See State v. Busse, 644 N.W.2d 79, 89 (Minn.2002). Mahdi did not argue below that his Miranda waiver was insufficient, and therefore the record has not been sufficiently developed for the court to consider this claim. See Johnson v. State, 673 N.W.2d 144, 147 (Minn.2004) (“One purpose of this rule is to encourage the development of a factual basis for claims at the district court level.”).
Mahdi next alleges that because he was a juvenile at the time of the crime, he was entitled to a certification hearing before being tried as an adult. Because the district court found by a preponderance of the evidence that Mahdi was 16 at the time of the murders, he is not entitled to a certification hearing. Minn.Stat. §§ 260B.007, subd. 6(b), 260B.101, subd. 2 (2012). Accordingly, this claim is without merit.
Finally, Mahdi alleges that a juror committed misconduct. Specifically, Mahdi alleges that the juror committed misconduct by telling a family member of one of the victims where the courthouse restrooms were during the trial, and then not telling the district court about the incident when she was asked. Mahdi hired a private investigator who spoke with the juror after the trial. In an affidavit, the investigator says that the juror told him she was “approaching the jurors’ door to the courtroom when an older woman wearing a hijab and appearing to be of Somali descent approached her and spoke with her briefly.” The juror then told the investigator that, “she didn’t tell the Judge about the woman approaching and speaking to her because [she] didn’t feel it was important to tell the Judge.”
Mahdi’s claim fails for several reasons. First, the affidavit is not part of the district court record and so we do not consider it. See State v. Manley, 664 N.W.2d 275, 286 (Minn.2003). Second, even if the affidavit was part of the record, it does not establish that the juror committed any misconduct. Her statements to the district court and the statements attributed to her in the affidavit are not inconsistent. The court was clearly concerned about any improper contact and asked the juror whether anybody present for the trial had talked to her. The court specifically asked the juror about spectators in the courtroom and witnesses in the trial, and about whether someone spoke to her about the case. Even if a Somali woman approached the juror and asked where the bathroom was, as asserted in the affidavit, there is no evidence that this woman was in any way associated with the trial or related to a victim. Therefore, Mahdi’s claim fails.
Affirmed in part, reversed in part, and remanded.

. Because several of the men involved in the events have the last name Ali, we will refer to them all with their first names.

. Mahdi was also convicted of two counts of second-degree murder under Minn.Stat. § 609.19, subd. 1(1) (2012) and a count of first-degree felony murder under Minn.Stat. § 609.185(a)(3) (2012), but he was not sentenced on these counts pursuant to Minn.Stat. § 609.035, subd. 1 (2012).

. Ahmed Ali and Abdisalan Ali are cousins, but neither of them is related to Mahdi Ali.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

.Ahmed eventually pleaded guilty and was convicted of three counts of attempting to commit aggravated robbery in the first-degree under Minn.Stat. § 609.245, subd. 1 (2012). He was sentenced to three consecutive 6-year sentences.

. During Mahdi’s initial age-determination hearing, DNA evidence was introduced confirming that Osman, whom Mahdi had previously believed to be his grandmother, was really his mother.

. As an alternative ground for excluding the birth certificate, the postconviction court found that the birth certificate could have been introduced at the original age-determination hearing if not for a "lack of diligence” on the part of Mahdi and his family. Because we affirm the postconviction court's ruling that excluded the birth certificate, we need not address this alternative ground.

. Rule 902(3)(B) provides an alternative means of satisfying the final certification requirement, but that provision is not at issue in this case.

. As the postconviction court noted, "the seal on the back” of the birth certificate did "not certify that the document is a true copy or that the signature on the document was made by someone authorized to do so.”

. Several days after the postconviction evi-dentiary hearing, defense counsel attempted to supplement the record with an affidavit. In defense counsel’s affidavit, she averred the following facts. Embassy staff told her that the unsigned certification letter was drafted by a man named Dennis Muhambe. Counsel wrote to Muhambe requesting confirmation of his position and his review of the birth certificate. Several days after the postconviction hearing, counsel received a copy of the original certification letter, with a business card for Muhambe attached by paper clip. Defense counsel submitted the business card to the postconviction court a few days after the hearing. The postconviction court did not expressly address, what, if any, effect the business card had on its analysis. We need not decide whether the attachment of Mu-hambe’s business card to a copy of the unsigned certification letter was sufficient to establish name or position of the person who reviewed the birth certificate for purposes of Rule 902(3), because, in any event, the unsigned certification letter failed to attest to the "genuineness” of the signature and official position of the Malindi District Registrar.

. As noted above, Mahdi also challenges the postconviction court's determination that the law of the case doctrine prevented it from reconsidering its conclusion as to Mahdi’s age, and argues that if the law of the case doctrine applies, the birth certificate is "new evidence” that operates as an exception to the law of the case doctrine. Because these alternative arguments depend on a determination that the birth certificate was admissible, and we have affirmed the postconviction court’s refusal to admit the certificate, it is not necessary for us to reach these alternative arguments.

. Rule 701 governs opinion testimony by lay witnesses. It provides that ”[i]f the witness is not testifying as an expert, the witness' testimony in the form of opinion or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.” Minn. R. Evid. 701. Rule 702 governs opinion testimony by expert witnesses. It provides "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.” Minn. R. Evid. 702.

. In the alternative, Mahdi argues that the testimony must be excluded because it is not admissible as either lay or expert opinion testimony under Rules 701 and 702. Mahdi’s argument fails because he is ignoring the rule of “multiple admissibility," which holds that "although a piece of evidence is inadmissible under one rule for the purpose given in offering it, it is nevertheless admissible if relevant and offered for some other purpose not forbidden by the rules of evidence.” Black's Law Dictionary 56 (10th ed.2014); see also State v. Wermerskirchen, 497 N.W.2d 235, 239 (Minn.1993). Even if Sergeant Kjos's testimony was actually inadmissible under Rule 701 or 702, an issue we need not decide, it was properly admissible for the purpose of providing context for the investigation.

. In an interview with police, Mahdi identified himself in the video from the impound lot. An audio recording from that interview was played for the jury. When he testified, Ahmed also identified himself, Mahdi, and Abdisalan in videos from the impound lot, the SuperAmerica, the Dahabshiil money transfer center, and the Seward Market.

. Because we determine that the district court did not abuse its discretion in admitting the testimony of the Target forensic experts under Rule 702, we do not need to consider Mahdi's contention that the forensic experts lacked firsthand knowledge and therefore that their testimony was inadmissible under Rule 701.

. In a footnote, the Supreme Court in Miller cited to Minnesota’s "heinous crimes” statute, Minn.Stat. § 609.106, as an example of a statute that, when applied to juveniles, impermis-sibly mandates life without parole without first considering the defendant's age. Miller, - U.S. at -, 132 S.Ct. at 2473 n. 13.

. See Act of June 2, 2005, ch. 136, art. 2, § 5, 2005 Minn. Laws 901, 922 (codified at Minn.Stat. § 609.106, subd. 2(1) (2012)).

. In addition to Fedziuk, the dissent of Justice Page cites a number of cases that purportedly support the application of the statutory-revival rule in this case, including Deegan v. State, 711 N.W.2d 89, 98 (Minn.2006), State v. One Oldsmobile Two-Door Sedan, Model 1946, 227 Minn. 280, 288, 35 N.W.2d 525, 530 (1948), and State v. Luscher, 157 Minn. 192, 195, 195 N.W. 914, 916 (1923). Infra at C/D-5 n.3. The dissent's reliance on these cases is misplaced because none of the cases involved a new rule of constitutional criminal procedure or a statutory amendment that was constitutional in some of its applications. Instead, the cases involved claims that the statutory amendment was unconstitutional in all applications. See Deegan, 711 N.W.2d at 98 (striking down an amendment that allowed the public defender to decline representation of an indigent defendant who pleaded guilty and received less than the presumptive sentence); One Oldsmobile Two-Door Sedan, 227 Minn. at 284-85, 35 N.W.2d at 528 (assuming without deciding that the amendment was unconstitutional due to variances between the enrolled bill approved by the governor and the bill actually passed by the Legislature); Luscher, 157 Minn. at 195, 195 N.W. at 916 (striking down an amendment that exempted practicing dentists from newly enacted prohibitions against false advertising and fee splitting).

. Fedziuk, on the other hand, does not provide a workable framework. In Fedziuk, we held that the implied consent law was facially unconstitutional. See 696 N.W.2d at 342. We then revived — in its entirety — the most recent previous version of the statute that would pass constitutional muster. See id. at 342, 349. Here, however, the statute is not facially unconstitutional; in fact, it is constitutional with respect to almost all of those to whom it applies — adults. The statutory mandate is unconstitutional only as applied to juveniles. Because the 2005 amendment to the heinous-crimes statute, Minn.Stat. § 609.106, is not unconstitutional on its face, a Fedziuk solution sweeps too broadly and undermines the legislative policy expressed in section 609.106. Citing a Florida Court of Appeals case the dissent of Justice Page argues, "Nothing prevents the court from reviving the 2004 statute only to the extent it applies to juvenile offenders.” Infra at C/D-7 (citing Horsley v. State, 121 So.3d 1130, 1132 (Fla.Dist.Ct.App.2013), rev. granted (Fla. Nov. 14, 2013)). The dissent’s argument is unpersuasive because even the Florida Court of Appeals is divided as to how to respond to Miller. Compare the Florida Court of Appeals fifth district’s decision in Horsley, 121 So.3d at 1132 (adopting a statutory-revival approach), with the fourth district’s decision in Dawson v. State, 142 So.3d 948, 949 (Fla.Dist.Ct.App.2014) (rejecting a statutory-revival argument and remanding for a Miller sentencing hearing), the third district’s decision in Hernandez v. State, 117 So.3d 778, 783-84 (Fla.Dist.Ct.App.2013) (same), and the first *256 district's decision in Washington v. State, 103 So.3d 917, 920 (Fla.Dist.Ct.App.2012) (same).

. The dissents contend that the approach we follow here is inconsistent with Axelberg v. Commissioner of Public Safety, 848 N.W.2d 206 (Minn.2014). We disagree. In Axelberg, we addressed and deferred to the Legislature’s expression of public policy in a "complete system of law” on the topic of administrative license revocation for impaired drivers. Id. at 211 (citation omitted) (internal quotation marks omitted). In this case, by contrast, the Legislature has not yet expressed its policy preference in light of the new rule Miller pronounced. As we recognized in Chauvin, the judiciary’s action in fashioning a sentencing procedure when the Legislature has not yet acted in response to a new rule does not run afoul of the separation of powers concerns we are to consider when exercising inherent authority. 723 N.W.2d at 27.

. Because only the mandatory imposition of a LWOR sentence for Mahdi's first-degree premeditated murder conviction is unconstitutional, the district court need not reconsider the sentences imposed for the first-degree felony murders of Mohamed Warfa and Anwar Mohammed.

. The State first argues that Mahdi forfeited this argument by not raising it below. We disagree. Ordinarily, we will not decide issues that were not raised before the district court, even when criminal defendants raise constitutional claims for the first time on appeal. See State v. Busse, 644 N.W.2d 79, 89 (Minn.2002). But in State v. Osborne, we concluded that the defendant did not forfeit consideration of his Blakely claim by failing to raise it in the district court because the Blakely rule was announced after his sentencing hearing. 715 N.W.2d 436, 442 (Minn.2006). Like the defendant in Osborne, we conclude that Mahdi did not forfeit consideration of his Miller claim by failing to raise it in the district court because the Miller rule was announced after Mahdi’s sentencing hearing.

. Because we have vacated Mahdi’s LWOR sentence and remanded for resentencing, we consider only the constitutionality of the consecutive imposition of the two sentences mandating life with the possibility of release after 30 years for the first-degree felony murders of Mohamed Warfa and Anwar Mohammed, under Minn.Stat. §§ 609.185(a)(3), 244.05, subd. 4(b).

. Mahdi also argues that the prosecutor committed misconduct, that the DNA experts made mistakes, and that the district court judge was "unfair.” We do not consider these arguments because they are simply argumentative assertions without any factual or legal support. See State v. Coe, 290 Minn. 537, 538, 188 N.W.2d 421, 422 (1971).