Filed 1/11/22  P. v. Pratt CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B306017 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA073799) |
| v. | |
| LATRELL PRATT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daviann L. Mitchell, Judge.  Affirmed with directions.

John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Matthew Rodriguez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Daniel C. Chang, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted Latrell Pratt of murder and possession of a firearm by a felon and found true the allegation he personally and intentionally discharged a firearm causing the death of Israel Castaneda. The trial court sentenced Pratt to 25 years to life, plus 25 years to life for the firearm enhancement.

Pratt argues the trial court erred in denying his motion under *Batson v. Kentucky* (1986) 476 U.S. 79 [106 S.Ct. 1712, 90 L.Ed.2d 69] and *People v. Wheeler* (1978) 22 Cal.3d 258 (commonly referred to as a *Batson/Wheeler* motion), admitting certain expert witness testimony, and imposing the firearm enhancement under Penal Code section 12022.53, subdivision (d), without exercising its discretion under section 12022.53, subdivision (h), to impose a lesser firearm enhancement.[1] We agree with Pratt's last contention, direct the trial court to exercise its discretion whether to impose a lesser firearm enhancement, and otherwise affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

### A.    *Pratt Shoots and Kills Castaneda*

One night in March 2018 Robert Ordaz went to a liquor store in a strip mall on 47th Street in Palmdale where he went every day to buy a beer and a lottery ticket. Ordaz spoke briefly to Castaneda, who also frequented the mall, outside the liquor store. Castaneda "did a little laugh" and approached someone in a parked car. The car left the parking lot, and Ordaz saw

---

[1]    Undesignated statutory references are to the Penal Code.

Castaneda get into a "confrontation" with a Black man outside the mall. Ordaz had seen the man "hundreds of times," but did not know him. The man wore a dark shirt and dark jeans with a white pattern on the back pockets and had "messed up corn rows." After arguing for less than two minutes, the man in dark jeans left the mall, but returned five or 10 minutes later.

Meanwhile, Ordaz got a hamburger from a fast food restaurant in the mall and returned to the liquor store. As he left the liquor store the second time, Ordaz saw the man in dark jeans summon Castaneda to an unlit area of the parking lot 40 feet from Ordaz. Ordaz heard gunshots and saw "the flash of the gun." Castaneda walked toward Ordaz and fell. Ordaz did not see the face of the shooter, who ran away.

Donyeld Bowen also saw Castaneda talking to a man as Bowen went into the liquor store. Bowen described the man as slim and tall, mid- to late-20s, Black or Hispanic, with braids that looked "like they needed to be redone" down to the back of his neck. Bowen said the man wore blue jeans, a black shirt, a dark beanie or hoodie, and black or black-and-white tennis shoes. As Bowen left the liquor store, he saw the man shoot Castaneda three times and run away. Castaneda died of his injuries.

B. *The Sheriff's Department Investigates the Shooting*

Los Angeles County Sheriff's detectives responded to the scene of the shooting and obtained surveillance video from several establishments, including the liquor store and a bakery next door. The bakery's surveillance camera captured some of the parking lot outside the liquor store. Videos taken close in time to the shooting showed a man wearing dark jeans with a white design on the back pockets talking to Castaneda, who was

3

wearing a light colored shirt.  The man in dark jeans wore them so low on his hips that he stepped on the bottom hems as he walked.

Sheriff's detectives interviewed Ordaz and Bowen about the shooting, showed them the surveillance videos, and asked them if they recognized anyone in the videos.  Ordaz told detectives the person he saw wearing dark jeans and talking to Castaneda the night of the shooting was the same person who appeared in the videos.  Ordaz did not recognize the man's face, but said the man's clothing was the same.  Bowen said the clothes he saw on the person in the videos were the same clothes he described to Sheriff's deputies worn by the shooter.[2]

Detectives also interviewed Anjad Al Saddi, the owner of the liquor store, who was working in the back of the store at the time of the shooting.[3]  Detectives showed Saddi a picture of the person Ordaz and Bowen identified from surveillance videos as the shooter, and Saddi said the person used to be a "regular," but Saddi did not know his name.  Saddi recalled he once kicked the man out of the liquor store for stealing.  Saddi said he saw the man near the bakery the night of the shooting wearing a beanie and talking to Castaneda.  Saddi told detectives the man's

---

[2]     Ordaz and Bowen testified reluctantly at trial and either denied telling detectives they recognized the person in the surveillance videos as the shooter or said they could not recall saying that.  The People introduced recordings of Ordaz's and Bowen's interviews with Sheriff's detectives, as well as transcripts of those interviews.

[3]     Saddi testified at trial, and the People played the recording of Saddi's interview with Sheriff's detectives for the jury.

mother was also a regular customer, and she drove a silver car manufactured by a Korean company. Saddi agreed to tell the detectives the next time the man's mother came into the store, and when he did, detectives obtained the license plate number for the silver car. In a separate interview detectives showed Saddi a six-pack photographic lineup that included a picture of Pratt. Saddi identified Pratt as the person he saw the night of the shooting outside the bakery.

Detectives used the license plate number of the silver car to obtain an address for Pratt's mother. Detectives executed a search warrant on that property, where Pratt also lived. Inside Pratt's bedroom, detectives found a pair of dark blue jeans with a white design on the back pockets and torn hems, a pair of black gloves, a beanie, a black vest, and a black sweatshirt. Gunshot residue tests identified particles consistent with or characteristic of gunshot residue on the front thigh area of the jeans, the sweatshirt, and one of the gloves.

Detectives arrested Pratt and seized his cell phone. Data extracted from the phone showed someone used it to search various "most wanted" lists and to view an article on a news website with the headline "Suspect Sought in Fatal Shooting of a Man in Palmdale." The phone also had been used for a search query including the terms "Palmdale," "homicide," and "47th."

C.      *A Jury Convicts Pratt of Murder, and the Trial Court Sentences Him*

The People charged Pratt with murder (§ 187, subd. (a)) and possession of a firearm by a felon (§ 29800, subd. (a)(1)). The People alleged Pratt personally used a firearm, within the meaning of section 12022.53, subdivision (b); personally and

intentionally discharged a firearm, within the meaning of section 12022.53, subdivision (c); and personally and intentionally discharged a firearm causing great bodily injury or death, within the meaning of section 12022.53, subdivision (d).  The People also alleged Pratt had served two prior terms within the meaning of section 667.5, subdivision (b).

On the People's motion, the court at trial struck the firearm allegations under section 12022.53, subdivisions (b) and (c).  The jury convicted Pratt on both counts and found true the allegation he personally and intentionally discharged a firearm causing great bodily injury or death, within the meaning of section 12022.53, subdivision (d).  On the murder conviction, the trial court sentenced Pratt to a prison term of 25 years to life, plus 25 years to life for the enhancement under section 12022.53, subdivision (d).  On the conviction for possession of a firearm by a felon, the court imposed and under section 654 stayed execution of a three-year prison term.  The court struck the enhancement under section 667.5, subdivision (b), because it no longer applied.[4] Pratt timely appealed.

---

[4]     The trial court sentenced Pratt in April 2020.  Senate Bill No. 136, effective January 1, 2020, amended section 667.5, subdivision (b), by limiting the applicability of the one-year prior prison term enhancement to defendants who served a prior prison sentence for a sexually violent offense, as defined in Welfare and Institutions Code section 6600, subdivision (b). (Stats. 2019, ch. 590, § 1; see *People v. Griffin* (2020) 57 Cal.App.5th 1088, 1092, review granted Feb. 17, 2021, S266521; *People v. Shaw* (2020) 56 Cal.App.5th 582, 588.)

# DISCUSSION

A.   *The Trial Court Did Not Err in Denying Pratt's* Batson/Wheeler *Motion*

### 1.   *Relevant Proceedings*

The trial court gave 49 prospective jurors, including six Black prospective jurors, a questionnaire. The questionnaire sought primarily personal information, such as the prospective juror's job, marital and family status, and previous jury experience. The court questioned each prospective juror about his or her responses to the questionnaire before allowing the attorneys 20 minutes to question the jurors.

Prospective Juror No. 8380 was a single Black woman who worked as a phone operator for a large retail company.[5] She told the court she had one adult son, who was getting a medical degree in psychiatry, and three adult daughters, who worked for a delivery service, for Medicare, and as a preschool teacher, respectively. Prospective Juror No. 8380 had lived in the area for 19 years. None of Prospective Juror No. 8380's responses to the court's questions prompted any concerns from the court. The court ended its questioning of Prospective Juror No. 8380 by stating, "Excellent. Very glad to have you."

---

[5]   During voir dire Prospective Juror No. 8380 was also referred to as Prospective Juror No. 14 and Prospective Juror No. 9, after she moved into the first Prospective Juror No. 9's seat. To avoid confusion, we will refer to her as Prospective Juror No. 8380.

After questioning the prospective jurors individually, the trial court questioned them as a group.  The court asked the prospective jurors to raise their hand if they had an affirmative response to any of the questions.  The questions sought to elicit biases and to identify prospective jurors who would not be able to follow the court's instructions on the law or keep an open mind until the end of the trial.  Prospective Juror No. 8380 did not raise her hand in response to any of the questions the court posed to the group.

Counsel for Pratt asked the group of prospective jurors questions about their ability to keep an open mind throughout the trial.  None of the prospective jurors raised his or her hand to indicate he or she could not be "a fair, open-minded juror."  The prosecutor asked the group questions about circumstantial evidence.  She selected several individual jurors to ask questions or pose hypotheticals.  The prosecutor asked Prospective Juror No. 8380 whether she could "vote guilty" on a charge for driving under the influence if the People proved only that the defendant had a blood alcohol content of .08 percent or above, but not the defendant's specific blood alcohol content, what the defendant had drunk, or where the defendant was going when stopped.  Prospective Juror No. 8380 replied yes.

The prosecutor used her first two peremptory challenges to ask the court to excuse a Hispanic man and a White man.  The prosecutor used her third peremptory challenge to ask the court to excuse Prospective Juror No. 8380.  Counsel for Pratt immediately made a *Batson*/*Wheeler* motion, arguing the People had exercised a peremptory challenge against one of only two Black prospective jurors in the first panel of 12.  The trial court observed there were four other Black prospective jurors in the

8

jury pool, which at that time comprised 44 people. The court found Pratt failed to make a prima facie showing the People used their peremptory challenge "for improper purposes in light of their peremptories thus far." The court then "invite[d] the prosecution to state the grounds and neutral reasons for excusing [Prospective Juror No. 8380] if they would like to do that to preserve [the record for appeal]."

The prosecutor stated she excused Prospective Juror No. 8380 because she had "observed her walk into court since early yesterday, and [she] often [saw] her looking toward the defendant with very sympathetic looks." The prosecutor continued: "I don't know—she hasn't said anything. She [was] not very vocal during voir dire; however, given the—I wouldn't say constant but frequent kind of gazes towards the defendant, kind of what I would describe in a sympathetic way, and we chose to use our peremptory challenge."

The court acknowledged that Prospective Juror No. 8380 was "an older African American woman" and that the defendant was "a younger man, probably the age of her grandchildren, if she has grandchildren." The court denied the motion, stating: "As I indicated, the defense has failed to make a prima facie case because they failed to raise a reasonable inference of exclusion based on membership of the cognizable group. [The] defense has stated only the excused jurors are a member of the cognizable group . . . ."

Counsel for Pratt argued Prospective Juror No. 8380 "said nothing during voir dire to justify her exclusion, and the prosecutor did not inquire of her during voir dire. They felt she was not vocal . . . ." The trial court stated, "The court did note that there [are] approximately six African Americans in the panel

9

that we're working with when we started the peremptory process. There [are] still five remaining . . . . The People have excused [one Hispanic, one White, and one Black prospective juror.] . . . I didn't personally observe the looks toward the defendant, but she is an elderly woman. The defendant is [a] young man, probably the age of her grandchildren if she had them, and I don't find that there was a basis or prima facie showing being made, and the People have . . . made a record should the appellate court disagree with me . . . . The court does believe that the defense has not met its burden of establishing that the motion should be granted, and the reasons offered by the prosecution I find to be credible under the circumstances in this case."

After excusing Prospective Juror No. 8380 the People excused one more prospective juror, whose race and ethnicity are unknown. The jury that eventually convicted Pratt included at least one Black juror.

### 2.      *Applicable Law and Standard of Review*

A "'prosecutor, like any party, may exercise a peremptory challenge against anyone, including members of cognizable groups. All that is prohibited is challenging a person *because* the person is a member of that group.'" (*People v. Hardy* (2018) 5 Cal.5th 56, 78; see *People v. Smith* (2018) 4 Cal.5th 1134, 1146 ["'a party may exercise a peremptory challenge for any permissible reason or no reason at all'"].) "Both the United States and California Constitutions prohibit the exercise of peremptory strikes on the basis of race or ethnicity." (*People v. Battle* (2021) 11 Cal.5th 749, 772 (*Battle*); see *People v. Reed* (2018) 4 Cal.5th 989, 999.) Courts follow a three-step process in ruling on a *Batson*/*Wheeler* motion. (*Battle*, at p. 772; *Reed*, at

10

p. 999.) "When a party opposing a peremptory strike makes a prima facie case that the strike was motivated by impermissible discrimination (step 1), the proponent of the strike must offer a nondiscriminatory reason for that challenge (step 2). [Citation.] The question then becomes (step 3) whether the opponent of the peremptory challenge has shown it "'more likely than not that the challenge was improperly motivated.'"" (*People v. Baker* (2021) 10 Cal.5th 1044, 1071; see *Battle*, at p. 772; *People v. Miles* (2020) 9 Cal.5th 513, 538.)[6]

"[W]here (1) the trial court has determined that no prima facie case of discrimination exists, (2) the trial court allows or invites the prosecutor to state his or her reasons for excusing the juror for the record, (3) the prosecutor provides nondiscriminatory reasons, and (4) the trial court determines that the prosecutor's nondiscriminatory reasons are genuine, an appellate court should begin its analysis of the trial court's denial

---

[6] The Legislature recently enacted legislation that significantly modifies the *Batson/Wheeler* framework. (See Code Civ. Proc., § 231.7, subd. (e).) Among other things, the new law essentially eliminates the requirement of making a prima facie case (*id.*, subd. (c)) and identifies certain reasons for peremptory challenges, including that the prospective juror "exhibited either a lack of rapport or problematic attitude, body language, or demeanor," as "historically . . . associated with improper discrimination in jury selection" (*id.*, subd. (g)(1)(B)). The new legislation does not apply to this appeal, however, because it applies to trials "in which jury selection begins on or after January 1, 2022." (*Id.*, subd. (i); see generally *Battle*, *supra*, 11 Cal.5th at p. 776, fn. 9 [because Code of Civil Procedure section 231.7 "has not yet taken effect," it "offers us no occasion to revisit . . . our *Batson/Wheeler* jurisprudence"].)

of the *Batson*/*Wheeler* motion with a review of the first-stage ruling.  [Citations.]  If the appellate court agrees with the trial court's first-stage ruling, the claim is resolved.  If the appellate court disagrees, it can proceed directly to review of the third-stage ruling, aided by a full record of reasons and the trial court's evaluation of their plausibility." (*People v. Scott* (2015) 61 Cal.4th 363, 391; see *People v. Krebs* (2019) 8 Cal.5th 265, 289-290 ["if the trial court makes a first-stage ruling before the prosecutor states his or her reasons for excusing the prospective jurors, an appellate court reviews that first-stage ruling"].)

Whether a defendant has established a prima facie case by demonstrating the totality of the relevant facts gives rise to an inference of discriminatory purpose "depends on consideration of the entire record of voir dire as of the time the motion was made." (*People v. Scott*, *supra*, 61 Cal.4th at p. 384; accord, *People v. Silas* (2021) 68 Cal.App.5th 1057, 1096; see *Battle*, *supra*, 11 Cal.5th at p. 773 ["We examine the entire record before the trial court to determine whether it supports an inference of such group bias."].)  "[C]ertain types of evidence may prove particularly relevant.  [Citation.]  Among these are that a party has struck most or all of the members of the identified group from the venire, that a party has used a disproportionate number of strikes against the group, that the party has failed to engage these jurors in more than desultory voir dire, that the defendant is a member of the identified group, and that the victim is a member of the group to which the majority of the remaining jurors belong." (*Scott*, at p. 384; accord, *Battle,* at p. 773; *Silas,* at p. 1096.)  "[T]he fact that the prosecutor volunteered one or more nondiscriminatory reasons for excusing the juror is of no

relevance at the first stage." (*Scott*, at p. 390; see *Silas*, at p. 1096.)

We review a first-stage ruling under *Batson*/*Wheeler* for substantial evidence. (*Battle*, *supra*, 11 Cal.5th at p. 772; *People v. Silas*, *supra*, 68 Cal.App.5th at p. 1095.) "In conducting our review, we remain mindful of the 'low threshold' showing required for *Batson's* first step. [Citation.] This step should not 'be so onerous that a defendant would have to persuade the judge—on the basis of all the facts, some of which are impossible for the defendant to know with certainty—that the challenge was more likely than not the product of purposeful discrimination.' [Citation.] It is satisfied simply by evidence sufficient to permit us to draw an inference that discrimination *may* have occurred." (*Battle*, at p. 773.) "In establishing a prima facie showing, a defendant has the burden of demonstrating that the facts and circumstances of the case raise an inference that the prosecutor excluded prospective jurors based on race." (*People v. Streeter* (2012) 54 Cal.4th 205, 223; see *People v. Rhoades* (2019) 8 Cal.5th 393, 430, fn. 15 ["it was defendant's burden to make the record necessary to support his motion"]; *People v. Jones* (2013) 57 Cal.4th 899, 916 [moving party has the burden to "'"make as complete a record as feasible"'" to support a prima facie showing].)

> 3. *Substantial Evidence Supported the Trial Court's Ruling Pratt Failed To Make a Prima Facie Case*

Pratt argues he made a prima facie showing of discriminatory motive because the prosecutor challenged one of

13

only two Black jurors in the initial panel of 12 prospective jurors.[7] Substantial evidence supported the trial court's ruling.

In *Battle*, *supra*, 11 Cal.5th 749 a Black defendant challenged the removal of a Black prospective juror after the prosecutor exercised peremptory challenges against two of three Black prospective jurors who "entered the [jury] box." (*Id.* at pp. 769-770.) The prosecutor "used two of his 11 peremptory challenges (18 percent) on Black prospective jurors, even though they comprised only 8.13 percent of the prospective jurors overall." (*Id.* at p. 770.) The jury that eventually convicted the defendant of murder was all White with one Black alternate juror, and the victims were White. (*Id.* at p. 771.) The Supreme Court acknowledged "the salient racial issues at play [were] significant," but held that, "standing alone, these factors are not

_____

[7]      Pratt argues his prima facie case is bolstered by the fact that two of the three jurors excused by the People were "minority jurors." Because this was not a basis for Pratt's *Batson*/*Wheeler* motion in the trial court, Pratt forfeited that argument on appeal. (See *Battle*, *supra*, 11 Cal.5th at p. 776; *People v. Booker* (2011) 51 Cal.4th 141, 167.) In any event, the record shows Prospective Juror No. 9—the Hispanic prospective juror the People challenged—told the court his grandfather was arrested and treated unfairly by law enforcement because he was "brown-skinned." It was not unreasonable for the prosecutor, under the law at the time, to exercise a peremptory challenge against a prospective juror who expressed such a potential bias against law enforcement officers. (See *People v. Rhoades*, *supra*, 8 Cal.5th at p. 431 ["when the record of a prospective juror's voir dire or questionnaire on its face reveals a race-neutral characteristic that any reasonable prosecutor trying the case would logically avoid in a juror, the inference that the prosecutor was motivated by racial discrimination loses force"].)

dispositive" of whether the defendant made a prima facie case of discriminatory motive. (*Id.* at pp. 774-775.) The Supreme Court discounted the prosecutor's disproportionate strike rate against Black prospective jurors because the "small sample size introduce[d] uncertainty into the analysis and severely limit[ed] the value of the data." (*Id.* at p. 775; see *id.* at p. 785 ["The small sample size of strikes against Black prospective jurors, and the fact that [the defendant] challenges the excusal of only one such juror, severely undercuts any inference we can draw from the statistical evidence he presents."].) The Supreme Court cited its prior statements that, "'[a]lthough circumstances may be imagined in which a prima facie case could be shown on the basis of a single excusal, in the ordinary case . . . to make a prima facie case after the excusal of only one or two members of a group is very difficult.'" (*Id.* at p. 776; accord, *People v. Bell* (2007) 40 Cal.4th 582, 598, fn. 3, disapproved on other grounds in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13; see *People v. Woodruff* (2018) 5 Cal.5th 697, 750 ["'[w]hile the prosecutor did excuse two out of three [Black prospective jurors], the small absolute size of this sample makes drawing an inference of discrimination from this fact alone impossible'"]; *People v. Parker* (2017) 2 Cal.5th 1184, 1212 ["'"'As a practical matter, . . . the challenge of one or two jurors can rarely suggest a *pattern* of impermissible exclusion.'"'"]; *People v. Harris* (2013) 57 Cal.4th 804, 835 ["the small number of African-Americans in the jury pool makes 'drawing an inference of discrimination from [the exclusion of two of three prospective African-American jurors] impossible'"].)

Other evidence in *Battle* weakened the defendant's prima facie showing, including that the prosecutor accepted a jury that

15

included a Black prospective juror (until counsel for the defendant exercised a peremptory challenge against him) and a Black alternate juror. (See *Battle*, *supra*, 11 Cal.5th at p. 777.) "'[U]ltimate inclusion on the jury of members of the group allegedly targeted by discrimination indicates "'good faith'" in the use of peremptory challenges, and may show under all the circumstances that no *Wheeler/Batson* violation occurred.'" (*Battle*, at p. 777; accord, *People v. Garcia* (2011) 52 Cal.4th 706, 747-748; see *People v. Reed*, *supra*, 4 Cal.5th at p. 1000 ["While acceptance of one or more black jurors by the prosecution does not necessarily settle all questions about how the prosecution used its peremptory challenges, these facts nonetheless help lessen the strength of any inference of discrimination that the pattern of the prosecutor's strikes might otherwise imply."].)

As in this case, the prospective juror at issue in *Battle* "had much to commend her." (*Battle*, *supra*, 11 Cal.5th at p. 779.) But the Supreme Court held that, "[s]o long as prosecutors are not motivated by discriminatory intent, they can strike prospective jurors for any reason—including for reasons that don't necessarily justify a challenge for cause." (*Ibid.*; accord, *People v. Rhoades, supra*, 8 Cal.5th at p. 435.) Although the prospective juror at issue in *Battle* expressed ambivalence about imposing the death penalty, the court made clear this was not the only relevant fact undermining an inference of discriminatory purpose in that case.[8] Indeed, even if a prospective juror makes

---

[8] In general, "a reviewing court may not rely on a prosecutor's statement of reasons to *support* a trial court's finding that the defendant failed to make out a prima facie case of discrimination." (*People v. Scott*, *supra*, 61 Cal.4th at p. 390; see *People v. Silas*, *supra*, 68 Cal.App.5th at p. 1096.) But "a

"proprosecution" statements, "the prosecutor is not required to take [a] juror's answers ""'at face value,'"" when "'other statements or attitudes of the juror suggest that the juror has 'reservations or scruples' about imposing [a penalty] . . . .'"" (*Battle*, at p. 779; see *ibid.* [prosecutors "don't have to accept a prospective juror simply because the juror may be proprosecution in some respects"].) Finally, the Supreme Court in *Battle* observed that the prosecutor in that case did not question the Black prospective jurors differently from other prospective jurors. (*Id.* at p. 783; see *Rhoades*, at p. 430 [record did not "reveal any apparent disparities in the nature or extent of the prosecutors' questioning of the African-American prospective jurors versus prospective jurors of other racial and ethnic backgrounds"].)

The prima facie showing of discriminatory intent was weaker in this case than it was in *Battle*. Both cases involved Black defendants who made a *Batson*/*Wheeler* motion after the prosecution exercised a peremptory challenge against a Black prospective juror. The prosecutor in Pratt's trial challenged one

---

court reviewing a first-stage ruling that no inference of discrimination exists 'may consider apparent reasons for the challenges discernible on the record' as part of its 'consideration of "all relevant circumstances."'" (*Scott*, at p. 390; see *Battle*, *supra*, 11 Cal.5th at p. 773 ["We may also consider nondiscriminatory reasons for the challenged strikes that are 'apparent from and "clearly established" in the record.'"].) In *Battle* the record was unclear about whether the prosecution offered a reason to challenge the prospective juror at issue when asked by the trial court to make a record for appeal, but the record revealed the prospective juror had made statements suggesting some unwillingness to impose the death penalty. (*Battle*, at pp. 771, 779.)

of two prospective Black jurors (50 percent, compared to 66.67 percent in *Battle*), and the rate of peremptory challenges by the prosecutor in this case against Black prospective jurors was less disproportionate to the jury pool than in *Battle*.[9]  Pratt did not allege the victim was the same race or ethnicity as the majority of the seated jurors (nor did he develop a record to make such a showing), the prosecutor accepted a jury that included a Black juror, and the prosecutor did not question Prospective Juror No. 8380 any more or less than other jurors.

Pratt argues there was nothing in Prospective Juror No. 8380's "profile" that "would indicate that she would identify with" Pratt and that the prosecutor's stated reason for striking Prospective Juror No. 8380—that she cast sympathetic looks at Pratt—is "unsupported by the record" and thus evidence of pretext.  But at the first stage of the *Batson/Wheeler* analysis we do not consider the prosecutor's stated reasons, if any, for exercising a peremptory challenge.  (*People v. Scott*, *supra*, 61 Cal.4th at p. 390; *People v. Silas*, *supra*, 68 Cal.App.5th at p. 1096.)  Only in the "'rare' circumstance" in which a prosecutor volunteers a justification that is "discriminatory on its face," is a prosecutor's stated reason for using a peremptory challenge relevant to the first-stage review.  (See *Scott*, at p. 391.)  The

---

[9]      In this case 25 percent of the prosecutor's peremptory challenges were against Black prospective jurors, who comprised 14 percent of the jury pool, a ratio of 1.78 to 1.  In *Battle*, 18 percent of the prosecutor's peremptory challenges were against Black prospective jurors, who comprised 8.13 percent of the jury pool, a ratio of 2.21 to 1.  (See *Battle*, *supra*, 11 Cal.5th at pp. 770, 775; see also *id.* at p. 775 ["we can glean only limited insight from the discrepancies"].)

prosecutor's stated reason for excusing Prospective Juror No. 8380 was not facially discriminatory.

Pratt therefore is left with the argument the prosecutor struck 50 percent of Black prospective jurors in the jury box at the time. Under the totality of the circumstances, that is not enough to show the trial court erred in denying Pratt's *Batson/Wheeler* motion. (See *Battle*, *supra*, 11 Cal.5th at p. 770; *People v. Reed*, *supra*, 4 Cal.5th at p. 1000 [prosecutor's peremptory challenges did not support an inference of discriminatory intent in the context of the entire jury selection process, where the prosecutor used approximately 63 percent of his first eight peremptory strikes on Black jurors, even though such jurors constituted only 34 percent of the venire]; *People v. Streeter*, *supra*, 54 Cal.4th at p. 223 [defendant's numerical analysis did not establish a prima facie case where the prosecutor exercised 60 percent of peremptory challenges against Black prospective jurors while only 28 percent of prospective jurors called to the jury box were Black].)

B.      *The Trial Court Did Not Commit Prejudicial Error in Admitting Testimony from a Forensic and Graphic Arts Expert*

The trial court admitted expert testimony from a forensic artist for the Sheriff's Department, Sandra Enslow, who gave an opinion on the similarities between a photograph of Pratt and the person appearing in the surveillance videos wearing dark clothing. She also gave an opinion on the similarities between a photograph of the jeans found in Pratt's bedroom and the jeans worn by the person in the surveillance videos. Pratt argues the trial court erred in admitting this testimony because the People

did not establish Enslow's expertise, the testimony was not beyond the everyday experience of jurors, and Enslow's opinion was "tantamount to an opinion on guilt."[10]  Any error in admitting Enslow's testimony, however, was harmless.

## 1. *Relevant Proceedings*

### a. *Pratt's Motion To Exclude Enslow's Testimony*

The People proposed to have Enslow compare a photograph of Pratt taken in custody with "a grainy enlarged portion of the [surveillance] video" and have her compare "a very grainy image of the pants worn by the shooter and a high-resolution image of the pants taken by the police" from Pratt's bedroom.  Before trial Pratt moved to exclude Enslow's testimony on the grounds that the jurors could make these comparisons without the assistance of an expert and that Enslow lacked relevant expertise.  The People argued Enslow would only "discuss the similarities but not . . . make any ultimate conclusions as to the individual or the clothing being the same individual or clothing seen [in the videos]."  The trial court tentatively granted Pratt's motion, but invited the People to provide authority for allowing Enslow to

---

[10]     Pratt also argues the testimony violated the "secondary evidence rule" under Evidence Code section 1523 and "was an unwarranted extension of the expert testimony rules."  Pratt forfeited these arguments by not making them in the trial court. (See *People v. Landry* (2016) 2 Cal.5th 52, 86 [""as a general rule, 'the failure to object to errors committed at trial relieves the reviewing court of the obligation to consider those errors on appeal""].)

testify about making these comparisons without stating the "ultimate conclusion" Pratt was "the person that committed the crime." The record does not show the People submitted any such authority.

During trial Pratt renewed his objection to Enslow's testimony. The prosecutor explained that, with regard to the photograph of Pratt, Enslow would compare the "facial features" of the person in the photograph with those of the person in the surveillance video and would testify they were "similar." The prosecutor also stated that, regarding the jeans in the photograph and the jeans in the video, Enslow would testify that, "in her educated opinion," they "are one and the same, and provide the basis for that opinion." Counsel for Pratt argued "all of this is not the subject for an expert opinion because [Enslow] hasn't done facial measurements. She hasn't enhanced the video. She hasn't done anything that one would associate with expert testimony. All she's doing is looking at one photograph and comparing it to another photograph and saying they look similar. That's something [for] the jury—they don't need any help doing that. That's not something an expert has a particular expertise in or something that would aid the jury." Counsel for Pratt also argued Enslow's "purported field of expertise is forensic graphic artist," which he contended was "not a field that is accepted as legitimate and in the field of forensic science or science in general."

The trial court agreed to hold a hearing under Evidence Code section 402, outside the presence of the jury, on the admissibility of Enslow's testimony. Subject to that hearing, the court anticipated it would allow Enslow to testify. The court said

21

Enslow's testimony would aid the jury by "identifying particular facial features and bringing [them] to [the jury's] attention."

At the hearing under Evidence Code section 402, Enslow testified she received a Bachelor of Arts degree from California State University at Los Angeles and worked first as an illustrator and graphic designer. As a graphic designer, Enslow said, she worked with "logo images," "patterning and imaging," and "different kinds of designs" for products including fabric and t-shirts. As a forensic artist, Enslow said, she was trained in illustration, rendering, and anthropology. She said she received six years of training with the Sheriff's Department and went to the FBI Academy and Northwestern University for additional training in forensic art. Enslow said that in her training she "learned how to work from video and look at images and . . . clarify for a detective what those images may look like and possibilities thereof." Enslow stated she was a member and fellow of the American Academy of Forensic Sciences and taught forensic art through the Academy and at the Los Angeles County Sheriff's Department Homicide School and Detective College. She said she taught detectives how to work with forensic artists and "how to get the most out of a forensic artist." Finally, Enslow said she lectured "nationally" and had recently given a lecture to wildfire investigators on how to use forensic artists as a resource, "especially using video." Enslow testified that in previous court appearances she had "been declared an expert" in facial imaging and as a forensic artist.

Enslow testified she had been a "graphic arts coordinator" and "lead forensic artist" for over 25 years for the Los Angeles County Sheriff's Department. In those roles she managed the forensic imaging unit in the homicide bureau, drew composite

images, and created facial reconstructions from skeletons. Enslow said she often "work[ed] from video" and did "comparisons," such as when a detective asked her to "create a facial image" to give the detective a sense of what a person shown in a video looked like. With regard to digital imaging, Enslow explained she had experience using photo editing software to modify digital images for photographic lineups to make them more "fair."

Enslow stated that in this case a detective asked her to "look at pictures in a video and then compare them to the photographs of a person, and then . . . to look at pictures in a video of a man wearing jeans and then a photograph of the jeans." The detective asked her, "'Do these appear to be similar,'" and Enslow said they were. Enslow said that, to form her opinion about the jeans, she looked at "pattern and imagery and shape." She said "those skills come from a lifetime, not only at the Sheriff's Department, but previous in my work in the private sector in looking at patterns and looking at designs." Enslow said she looked at the jeans and the video, identified the "best comparison stills" from the video, and compared them. Enslow said that, to form her opinion about the images of Pratt, she relied on her "education as to [her] knowledge about the human face and how the human face is built—skull, musculature—and the images [she saw] in the video." She stated that, "because of the presence and the absence of light," she "was able to make a favorable comparison." Enslow said that the video images she reviewed were not enhanced in any way and that she did not make any facial measurements by, for example, measuring the distance between the subject's eyes. The trial court allowed Enslow to testify.

b. *Enslow's Trial Testimony*

After reciting her education, training, and work experience for the jury, Enslow compared a photograph of the jeans found in Pratt's bedroom with the jeans in an image of the person wearing jeans in the surveillance video from the night of the shooting. Enslow said she first "noticed everything about the jeans that [she] could," including the brand ("Royalty"), the image on the pockets of the jeans, and the design around the pocket. Enslow called the design "very distinctive" and "very specific." Enslow said she reviewed the video, which was "clearer" to watch while the video was running than when the video was stopped. Enslow concluded "the image on the person in the video, on his jeans, and the [photograph of the] jeans I was asked to compare look similar." Enslow created two screenshots from the video, and the court admitted them into evidence. One of them showed a "paisley image" at the bottom of the jeans pocket with "two wings on either side of it and a flower image in the middle." Enslow also observed that the person in the video wore his jeans so low he "appear[ed] to be walking on the backs" of the jeans and that the jeans in the photograph from Pratt's bedroom were "quite ragged and torn."

Next, Enslow compared the surveillance videos to photographs of a "person of interest" given to her by a Sheriff's Department detective. Enslow testified she watched the videos and observed the person's nose, cheekbones, mouth, chin, and jawbone. The People introduced a one-page document that included booking photographs of Pratt and still images of the individual wearing dark clothing in the surveillance videos. Using those images, Enslow identified the facial features she found "helpful" in concluding the images were "similar," including

24

the nose ("shorter, compact, soft, round," with "a very low bridge"), the "fullness of the lips," and the angles of the cheekbones and jawline. Enslow stated there were "many different areas on [the face in the photographs] that show in th[e] video." As in the case of the jeans, Enslow said the video images were clearer than screenshots of the video. Enslow testified that she was "not identifying anyone," but that the images from the surveillance video "have similarity" to the images of the person in the booking photographs.

During cross-examination Enslow stated that she selected the screenshots to use for her comparisons, but that she did not alter the lighting or zoom in on the video images to create the screenshots. She did, however, enlarge one of the screenshots for "presentation purposes." She said it was somewhat difficult to use the screenshots for comparison purposes because the still shots "blur[red] up," which is why she also reviewed the video. Enslow said she did not believe image enhancement software would give "better definition" to the images for purposes of comparing them.

Counsel for Pratt asked Enslow about the brand name "Royalty" that appeared in the picture of the jeans found in Pratt's bedroom and whether it appeared in any of the video images she reviewed. Enslow said, "Not that I could tell," but she explained she would not expect its "thin and delicate" typeface to show up in the video because it was "difficult to read." Counsel for Pratt also asked Enslow whether the design on the jeans in the video appeared to be lower than the design on the jeans found in Pratt's bedroom. Enslow said the design on the jeans in the video only appeared to be lower because the person wore the

25

jeans low, "hanging on the back of his thigh," rather than "hiked up around his waist."

Regarding her facial comparison analysis, Enslow said she based her conclusion on similarities in the subject's broad nose, mustache, full lips, and strong jaw. She admitted these features were "common" or "relatively common" in the African American community, and thus it was fair to say the individual in the video was similar in appearance to many people in that community.

c.     *Pratt's Expert Witness's Trial Testimony*

Pratt called Thomas Guzman-Sanchez, an "audio and video forensic" expert, to testify about the same comparisons Enslow made. Guzman-Sanchez testified he followed the standards created by the Scientific Working Group for Digital Media, which has "best practices for digital media photographic comparison."

To make the comparisons, Guzman-Sanchez magnified still images from the surveillance video and superimposed arrows on the images to highlight certain items for the jury. He "clarified" an image that included the nose of the person shown in the video and noticed "there was a notable difference in the profile" of that person and the profile of Pratt as shown in the booking photographs. According to Guzman-Sanchez, the person in the surveillance video "had a notably longer or an extended nose than [Pratt]." Guzman-Sanchez also testified the "nose shape" of the person in the surveillance video was consistent across multiple frames of the video, which led him to believe the longer nose was an "actual physical feature" of the person in the video and not a distortion from the camera's lens. Guzman-Sanchez pointed out some "definite similarities" between Pratt and the "target" image

in the video, but "also unique individualizing characteristics" that prevented an "empirical[] match."

In comparing the photograph of the jeans found in Pratt's bedroom with those in the surveillance video, Guzman-Sanchez testified the still images of the video provided by the Sheriff's Department were "not true to the actual digital image" because "it's very dark." Guzman-Sanchez said he extracted images from the video and put them into a software program, magnified the images without distorting them, used a "lumina filter" to "bring out certain aspects" of the images, and may have also used a "very slight sharpening filter." Guzman-Sanchez described the image on the jeans from Pratt's house as "a very detailed lion" with "brocade" around it. He said the image on the jeans from the video looked more like "a Japanese Kanji letter."[11] He also superimposed the two images and concluded they were "similar," but he could not "match them empirically as the same . . . due to design differences."

2.      *Applicable Law and Standard of Review*

"'While lay witnesses are allowed to testify only about matters within their personal knowledge (Evid. Code, § 702, subd. (a)), expert witnesses are given greater latitude. "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him

---

[11]     Kanji are actually characters, not letters. (*Kaiser Foundation Health Plan, Inc. v. Abbott Laboratories, Inc.* (9th Cir. 2009) 552 F.3d 1033, 1049; see *Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.* (2d Cir. 1999) 175 F.3d 266, 269, fn. 2 ["Katakana, Hiragana, and Kanji are . . . three different writing systems in the Japanese language"].)

as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) An expert may express an opinion on "a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.""" (*People v. Duong* (2020) 10 Cal.5th 36, 60; see *People v. McDowell* (2012) 54 Cal.4th 395, 425-426 ["'Expert opinion testimony is admissible only if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact."'"]; *Menifee v. Superior Court* (2020) 57 Cal.App.5th 343, 360 ["""The requirements for expert testimony are that it relate to a subject sufficiently beyond common experience as to assist the trier of fact and be based on matter that is reasonably relied upon by an expert in forming an opinion on the subject to which his or her testimony relates."'"].)

"'When expert opinion is offered, much must be left to the trial court's discretion.'" (*People v. McDowell*, *supra*, 54 Cal.4th at p. 426.) "'"We are required to uphold the trial judge's ruling on the question of an expert's qualifications absent an abuse of discretion. [Citation.] Such abuse of discretion will be found only where "'the evidence shows that a witness *clearly lacks* qualification as an expert . . . .'"'"" (*People v. Pearson* (2013) 56 Cal.4th 393, 445; accord, *People v. Morales* (2020) 10 Cal.5th 76, 97; see *People v. Polk* (2019) 36 Cal.App.5th 340, 353 [the determination that a witness qualifies as an expert is "within the discretion of the trial court and will not be disturbed without a showing of a 'manifest abuse'"].) Similarly, the "'trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion.'" (*People v. Duong*, *supra*,

28

10 Cal.5th at p. 60; accord, *People v. Brown* (2014) 59 Cal.4th 86, 101; *People v. James* (2021) 70 Cal.App.5th 1031, 1051; see also *People v. Peterson* (2020) 10 Cal.5th 409, 457 ["We review the decision to admit the expert testimony for abuse of discretion."].)

3.  *The Trial Court Did Not Abuse Its Discretion in Ruling Enslow Was Qualified To Testify as an Expert*

Pratt argues the trial court erred in ruling Enslow was qualified to give expert testimony because "[s]he presented no evidence of training in the specific area of comparing persons in videos to photographic evidence or in comparing garment patterns." Pratt does not argue Enslow lacked expertise in forensic art or in graphic design.

When a party objects to an expert witness's qualifications, Evidence Code section 720 requires the party offering the expert testimony to demonstrate the expert's special knowledge, skill, experience, training, or education before the witness may testify as an expert. (*People v. Townsel* (2016) 63 Cal.4th 25, 45.) "'"'The competency of an expert is relative to the topic and fields of knowledge about which the person is asked to make a statement.'"'" (*People v. DeHoyos* (2013) 57 Cal.4th 79, 128; see *People v. Tuggle* (2012) 203 Cal.App.4th 1071, 1079 ["'[T]he qualifications of an expert must be related to the particular subject upon which he is giving expert testimony.'"].) "'Whether a person qualifies as an expert in a particular case . . . depends upon the facts of the case and the witness's qualifications.'" (*Tuggle*, at p. 1079; see *People v. Bloyd* (1987) 43 Cal.3d 333, 357.) "'When a preliminary showing is made that the proposed witness has sufficient knowledge to qualify as an expert under

29

the Evidence Code, questions about the depth or scope of his or her knowledge or experience go to the weight, not the admissibility, of the witness's testimony.'" (*People v. Jackson* (2016) 1 Cal.5th 269, 327-328; accord, *People v. Jones*, *supra*, 57 Cal.4th at pp. 949-950; see *People v. Brown*, *supra*, 59 Cal.4th at p. 100 ["'Once an expert witness establishes knowledge of a subject sufficient to permit his or her opinion to be considered by a jury, the question of the degree of the witness's knowledge goes to the weight of the evidence and not its admissibility.'"].)

As discussed, Enslow testified that in her forensic art training she learned how to look at video images and explain them to a detective and that she taught law enforcement how to use forensic artists as a resource. Enslow did not say she had any specific education or training in comparing video images to photographic images, but she appears to have used her work experience in the Sheriff's Department and expertise in forensic arts and graphic design to identify meaningful features of Pratt's face and jeans in the video and photographic images. (See *People v. Bolin* (1998) 18 Cal.4th 297, 322 [criminalist properly relied on his educational background in biochemistry and serology, and his training as a criminalist for 13 years, to form his opinion about the position of the victim after the first and second fatal shots]; see also *People v. Morales*, *supra*, 10 Cal.5th at p. 99 [expert's lack of academic credentials did not show he clearly lacked the necessary qualifications, where the expert had "relevant on-the-job training and experience"].) Although Enslow's qualifications were not particularly impressive and the evidence of her credentials was thin,[12] we cannot say she lacked the

---

[12]    In contrast, the expert in *People v. Tran* (2020) 50 Cal.App.5th 171 had "30 years of experience as a certified

qualifications to enable her to testify about the similarities between the images in the surveillance videos and the photographs.

Pratt argues Enslow's opinions were not "verified as correct through any scientific testing or blind comparisons" and were not admissible under the standard in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579 [113 S.Ct. 2786, 125 L.Ed.2d 469] (*Daubert*) for the admissibility of scientific evidence. But Pratt concedes the test applicable in California under *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*) and *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013 (*Frye*) for the admissibility of expert testimony based on new scientific techniques does not apply here because Enslow's opinions were not "scientific." We agree with this concession: Enslow's opinions did not rely on the type of scientific evidence that requires additional scrutiny under *Kelly/Frye*. (See *People v. Peterson*, *supra*, 10 Cal.5th at p. 444 ["*Kelly* "'only applies to that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law.'"']; *People v. Lapenias* (2021) 67 Cal.App.5th

forensic video analyst," a "degree in television broadcast communications with an emphasis on television engineering," headed a police department's forensic video unit, was "the principal instructor for the Law Enforcement and Emergency Services Video Association (LEVA)," "trained video analysts throughout the world," "served as an instructor at the FBI National Academy," and was "certified in the area of forensic video analysis by LEVA." (*Id.* at p. 179.) Night and day.

162, 173 [same].)[13]  Moreover, the Supreme Court has stated that, "[n]otwithstanding *Daubert*, *Kelly*/*Frye* remains the law of California."  (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 831, fn. 7; see *People v. Lucas* (2014) 60 Cal.4th 153, 245, fn. 36 [Supreme Court has not indicated "any move away from the *Kelly* test toward the federal *Daubert* standard], disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.)

Pratt also argues the trial court failed to exercise its "gatekeeper" function under *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 to exclude testimony that lacks sufficient "'intellectual rigor.'" (*Id.* at p. 772.)  Pratt argues Enslow must have based her opinion on something more than her "self-proclaimed expertise."  But as discussed, Enslow testified about her education, training, and experience in forensic arts, some in video and photographic

---

[13]  "[A]dditional scrutiny [under *Kelly*] 'is justified because "[l]ay jurors tend to give considerable weight to 'scientific' evidence when presented by 'experts' with impressive credentials. We have acknowledged the existence of a '. . . misleading aura of certainty which often envelops a new scientific process, obscuring its currently experimental nature.'"' [Citation.]  [¶]  But in most cases no similar caution is required before a jury considers expert opinion testimony.  Unlike results 'produced by a machine,' to which jurors may 'ascribe an inordinately high degree of certainty,' jurors presented with the personal opinion of a witness, even an expert witness, 'may temper their acceptance of his [or her] testimony with a healthy skepticism born of their knowledge that all human beings are fallible.'"  (*People v. Peterson*, *supra*, 10 Cal.5th at pp. 457-458.)

imaging and at least a little in graphic design. Her opinions were based on (a little) more than "self-proclaimed expertise."

4.      *Any Error in the Trial Court's Ruling Enslow's Opinions Would Assist the Jury Was Harmless*

Whether the trial court abused its discretion in allowing Enslow to testify that the person in the surveillance video looked similar to Pratt and wore jeans similar to the jeans found in Pratt's bedroom is a closer call. As Pratt argues, jurors in their everyday lives make comparisons of objects and persons. Thus, Pratt argues, Enslow's testimony did not assist the jury and was not beyond common juror experience. He has a point.

In many cases where a court has allowed expert testimony consisting of video and photographic comparisons, the expert had manipulated, enhanced, or otherwise edited the video recordings to make them easier for the jury to view, or the expert provided insights into how the medium (video or photograph) portrayed a subject given the circumstances in which the image was recorded (for example, ambient lighting or reflections). (See *People v. Tran* (2020) 50 Cal.App.5th 171, 189; see also *United States v. Alexander* (5th Cir. 1987) 816 F.2d 164, 168 [testimony of a "photographic comparison expert" that "the amount of distortion in the pictures taken by the bank surveillance cameras" affected the subject of the photographs, and photos taken by the expert that "duplicated the exact distance, camera angle, and focal length of those taken at the bank," aided the jury in visually comparing the photos]; *United States v. Sellers* (4th Cir. 1977) 566 F.2d 884, 886 [expert testimony "may assist the jury's evaluation of photographs by explaining the effects of light, shadow, and reflections, and the distortion caused by the

33

perspective of the picture, and other technical factors"]; *State v. Ali* (Minn. 2014) 855 N.W.2d 235, 251-252 [trial court did not abuse its discretion in admitting the testimony of a forensic expert who "'performed enhancements to the images that [he] extracted' from videos" and testified "about how variations in video quality and lighting could cause variations in the images that the jury saw" and that "the camera angle and distance from the camera" indicated "that one suspect [was] taller than the other"]; *Stevenson v. State* (Tex.Ct.App. 2010) 304 S.W.3d 603, 609-610, 621-622 [trial court did not abuse its discretion in admitting the testimony of a forensic video analysis expert who "overlaid . . . 911 calls onto the surveillance videotape"; interpreted a poor quality, black-and-white surveillance video for the jury; and superimposed on the video a "'Measurement Standard'" placed on the floor of the store where a robbery happened "to show the relative height of one of the robbers against the 'Measurement Standard'"].) Such enhancements and expertise allow a "layperson [to] appreciate what they are looking at." (*Stevenson*, at p. 621.)

Enslow did not manipulate or enhance the video she reviewed, create new images based on forensic expertise to enable the jury to extract certain information from the surveillance video, or use any knowledge of video or photographic imaging to interpret the surveillance video. She merely looked at and compared the same surveillance video, and the same photographs of Pratt and his jeans, the jurors also saw. Under these circumstances, Enslow's testimony at least came dangerously close to invading the province of the jury. (See *United States v. Dorsey* (4th Cir. 1995) 45 F.3d 809, 815 ["the comparison of photographs is something that can sufficiently be done by the

34

jury without help from an expert"]; *United States v. Brewer* (9th Cir. 1986) 783 F.2d 841, 842 [district court did not err in excluding expert photographic comparison testimony where "the untrained jury could compare the photographs of the robber with those of [the defendant] without the special assistance of an expert"]; *United States v. Trejo* (9th Cir. 1974) 501 F.2d 138, 143 [district court erred in admitting expert testimony comparing surveillance video to photographs of the defendant where the expert "did not in fact touch on any matter, or offer any observations of the evidence that would not have been beyond the normal faculties of observation of a jury," and "[t]here were no unusual or peculiar idiosyncrasies, or detailed analyses of facial formations which the jury could not undertake on its own as part of its fact-finding function"].) The jurors were just as capable of looking at and comparing the pictures as Enslow was.

The People rely on *United States v. Cairns* (9th Cir. 1970) 434 F.2d 643. In that case the district court admitted expert testimony from a "photographic identification specialist" comparing surveillance video from the time of a robbery and a police photograph of the defendant. (*Id.* at p. 644.) The expert enlarged the head area of a photograph taken from the surveillance video to match the size of the defendant's head in the police photograph. "The witness then pointed out the similarity in the two photographs in the nose and mouth areas, chin line, hair lines, ear contours and inner folds of the ears, among other things. He then testified that based on all the general characteristics the individual in the surveillance photograph is the individual in the police photograph 'or another individual having all of these characteristics as to nose, mouth, chin, and the ear characteristics . . . .'" (*Ibid.*) The Ninth Circuit found no

error.[14] (*Ibid.*; see *United States v. Snow* (6th Cir. 1977) 552 F.2d 165, 167 [district court did not abuse its discretion in admitting expert testimony comparing photographs of the defendant with a bank's surveillance photographs]; *United States v. Green* (8th Cir. 1975) 525 F.2d 386, 391-392 [expert testimony comparing surveillance photographs and photographs of the defendant's clothes was admissible where "a jury of twelve laymen would not have the experience to note the unique curl of the cuffs of the jacket, the electrical alligator clip, the crease in the pants cuff, the way the seams of the pants lined up, the worn spots on the pants, and the eyelets and lacing of the shoes"]; *United States v. Brown* (2d Cir. 1975) 511 F.2d 920, 924 [district court did not abuse its discretion in admitting expert testimony comparing bank surveillance photos of the robber with known photographs of the defendant, where the expert took new photographs of the defendant "in a position as nearly as possible identical with [the robber's] location in the bank"]; *State v. Ali*, *supra*, 855 N.W.2d at p. 251 [expert testimony comparing "pictures of pants" the "police recovered at [the defendant's] apartment with the images of pants that were recorded in . . . various surveillance videos" was admissible where the expert "pointed out various details in the pants that were apparent in the surveillance videos, such as contrast in the fabric on one of the thighs"]; cf. *United States v. Fadayini* (D.C. Cir. 1994) 28 F.3d 1236, 1241 [district court did not abuse its discretion in admitting expert testimony identifying

---

[14]     *Cairns* was later "reexamined" and limited to circumstances where an offer of proof convinces the court by a preponderance of the evidence "the offered testimony will bring to light facts beyond the common knowledge and experience of the jury." (*United States v. Trejo*, *supra*, 501 F.2d at p. 143.)

the defendant from ATM photographs because the testimony "may have served to focus the jury on particular characteristics of the defendants (e.g., facial features, distinguishing marks), thereby aiding the jurors' independent assessments of the photographs," but the court stated that "the untrained juror could fully assess the photographs without the assistance of the expert"].)

We would be more inclined to find error with the trial court's admission of Enslow's testimony that the image of Pratt in photographs was "similar" to the person appearing in the surveillance videos than with her testimony that there were similarities between the jeans in the photograph and the jeans worn by the person in the surveillance video. At least in the latter case, Enslow's explanations for why the "Royalty" label was not visible on the jeans in the video, and why the design elements on the jeans worn by the person in the surveillance video appeared lower than they did in the photograph taken by Sheriff's detectives, gave the jurors information that may (*may*) have been beyond their common experience. But nothing Enslow said in comparing the still video images to photographs of Pratt was particularly helpful to the jurors. As was true with the expert witness in *United States v. Trejo, supra*, 501 F.2d 138, Enslow did not identify any unusual physical characteristics in her subjects or do any factual analysis that the jurors could not do on their own (and that jurors do all the time). (*Id.* at p. 143.) Enslow testified there were "many different areas" of Pratt's face in his booking photographs "that show in th[e] video." In that case, the jurors could have compared the booking photographs of Pratt to the surveillance video (and the still images taken from the video), just as Enslow did.

37

But any error in admitting Enslow's testimony was harmless under *People v. Watson* (1956) 46 Cal.2d 818. (See *People v. Pearson*, *supra*, 56 Cal.4th at p. 446 ["'[t]he erroneous admission of expert testimony only warrants reversal if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"'"]; *People v. Prieto* (2003) 30 Cal.4th 226, 247 [*Watson* harmless-error standard applies to the erroneous admission of expert testimony].) The testimony of Ordaz, Bowen, and Saddi overwhelmingly implicated Pratt as the shooter; there were no other reasonable possibilities. Ordaz saw the person wearing dark clothing in the surveillance video talking to Castaneda moments before the shooting, Bowen identified the shooter as the person wearing dark clothes in the surveillance video, and Saddi identified the person wearing dark clothes in the surveillance video as Pratt, a "regular" in Saddi's liquor store. Neither Ordaz nor Bowen said he saw Castaneda with anyone else in the moments before the shooting. And the jeans (including their ragged hems), gunshot residue, and cell phone data all corroborated the witnesses' collective testimony that Pratt was the shooter.

Moreover, Enslow did not testify that Pratt was the same person or that the jeans found in his bedroom were the same jeans in the surveillance videos, and her opinions "'did not bind the jurors . . . or preclude them from considering other relevant evidence.'" (*People v. Brown*, *supra*, 59 Cal.4th at p. 101.) The jurors heard conflicting expert opinions (cf. *United States v. Sellers*, *supra*, 566 F.2d at p. 886 [trial court's error in excluding testimony by the defendant's expert that the defendant was not the person shown in surveillance photographs, while admitting

38

the testimony of the prosecution's expert that it was impossible to determine from the photographs whether the defendant was the perpetrator, was prejudicial]), and in their closing arguments both the prosecutor and counsel for Pratt urged the jurors to review the video and photographs and decide for themselves whether the photographic evidence implicated Pratt. And the trial court properly instructed the jurors they should determine "the meaning and importance of any [expert] opinion," "consider the expert's knowledge, skill, experience, training, and education, [and] the reasons the expert gave for an opinion," and "the facts or information on which the expert relied on reaching that opinion." The court also told the jurors to "disregard any opinion that [they] found unbelievable, unreasonable, or unsupported by the evidence." Under these circumstances, any error in admitting Enslow's testimony was harmless. (See *Brown*, at p. 101 [erroneous admission of expert testimony was harmless where the "court properly instructed the jury regarding the consideration of expert testimony, telling jurors they were not bound to accept [an expert's] opinion," "'should give to it the weight to which [they] find it to be entitled,'" and could "'disregard any such opinion'"].)[15]

---

[15] Pratt argues we should evaluate whether the admission was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 because the trial court "undermine[d] the prosecution's burden to prove all elements to a jury beyond a reasonable doubt." Pratt contends Enslow's testimony "impacted upon the jury's determination of the only direct evidence of the perpetrator." But Enslow's testimony was not the only evidence of the perpetrator's identity. Taken together, the testimony of Ordaz, Bowen, and Saddi also identified Pratt as the shooter.

39

Nor, contrary to Pratt's assertion, was Enslow's testimony "tantamount to an opinion on guilt." "'Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact.'" (*People v. Brown*, *supra*, 59 Cal.4th at p. 101; see Evid. Code, § 805.) Enslow did not give an opinion on Pratt's guilt; she stated only that the person in the surveillance videos looked similar to Pratt and that his jeans also looked similar. As discussed, Pratt's expert witness gave contrary opinions, and the court told the jurors they were not bound by either witness's testimony. (See *Brown*, at p. 101; see also *People v. Lindberg* (2008) 45 Cal.4th 1, 49 [expert witness's opinion the defendant was a White supremacist was not an opinion on the defendant's guilt, where the expert "stated no opinion as to defendant's guilt or the truth of the [hate-murder] special circumstances," and the expert's opinion "did not bind the jurors on this point or preclude them from considering other relevant evidence"].)

C. *Remand Is Appropriate for the Trial Court To Exercise Its Discretion Whether To Impose a Lesser Firearm Enhancement Under Section 12022.53*

As stated, the trial court imposed a term of 25 years to life for the firearm enhancement under section 12022.53, subdivision (d), for personally and intentionally discharging a firearm causing great bodily injury or death. The trial court sentenced Pratt after the Legislature amended section 12022.53, subdivision (h), to give the court the discretion to strike or dismiss firearm enhancements under section 12022.53. (Stats. 2017, ch. 682, § 2, eff. Jan. 1, 2018.) But neither the trial

court, counsel for Pratt, nor the prosecutor was aware of the court's sentencing discretion.  The People concede remand is appropriate to give the court an opportunity to exercise its discretion under section 12022.53, subdivision (h).  (See *People v. Flores* (2020) 9 Cal.5th 371, 431-432 [appropriate remedy is to remand for resentencing where a court is unaware of the scope of its discretionary powers, "'unless the record "clearly indicate[s]" the trial court would have reached the same conclusion "even if it had been aware that it had such discretion"'"]; *People v. Ochoa* (2020) 53 Cal.App.5th 841, 853 [same].)

The parties disagree, however, about the scope of the trial court's discretion on remand.  Pratt cites *People v. Morrison* (2019) 34 Cal.App.5th 217 (*Morrison*) for the proposition the trial court has discretion to impose or strike the enhancement under section 12022.53, subdivision (d), or to impose a lesser enhancement under section 12022.53, subdivision (b) or (c).  The People argue *Morrison* was wrongly decided and cite *People v. Tirado* (2019) 38 Cal.App.5th 637, review granted November 13, 2019, S257658 (*Tirado*), for the proposition section 12022.53, subdivision (h), does not authorize a trial court "to substitute one enhancement for another."  (*Tirado*, at p. 643.)[16]  The Supreme

---

[16]     See also *People v. Hoang* (2021) 66 Cal.App.5th 1020, 1024 ("the plain language of section 12022.53, subdivision (h) authorizes a trial court to strike or dismiss a firearm enhancement only; it does not permit the court to substitute a lesser firearm enhancement"), review granted September 29, 2021, S270553; *People v. Delavega* (2021) 59 Cal.App.5th 1074, 1087-1088 (same), review granted April 14, 2021, S267293; *People v. Valles* (2020) 49 Cal.App.5th 156, 166 (same), review granted July 22, 2020, S262757; *People v. Yanez* (2020)

41

Court will very soon decide the issue. (See *People v. Garcia* (2020) 46 Cal.App.5th 786, 788, review granted June 10, 2020, S261772 (*Garcia*).) But for now, we believe *Morrison* is better reasoned.

As the court in *Morrison* explained, "Case law has recognized that the court may impose a 'lesser included' enhancement that was not charged in the information when a greater enhancement found true by the trier of fact is either legally inapplicable or unsupported by sufficient evidence." (*Morrison*, *supra*, 34 Cal.App.5th at p. 222.) The same principle gives the court discretion to impose an enhancement under section 12022.53, subdivision (b) or (c), that was not presented to the jury. Indeed, the Legislature's purpose in amending section 12022.53, subdivision (h), was to expand the trial court's discretion to reduce criminal sentences in appropriate cases, not to restrict it. (See Sen. Com. on Public Safety, Analysis of Sen. Bill No. 620 (2017-2018 Reg. Sess.) as amended Mar. 28, 2017, p. 3 [Senate Bill No. 620 "would allow a court to use judicial discretion when applying a sentence enhancement when a person uses or discharges a firearm when a person is convicted for committing a felony"]; *id.* at p. 8 [Senate Bill No. 620 "allows a court to use judicial discretion and take into account the nature and severity of the crime and other mitigating and aggravating factors during sentencing" and "provides judges the ability to impose sentences that fit the severity of the offense"]; Assem. Com. on Public Safety, Analysis of Sen. Bill No. 620 (2017-2018 Reg. Sess.) as amended Mar. 28, 2017, p. 8 [Senate Bill No. 620

---

44 Cal.App.5th 452, 459-460 (same), review granted April 22, 2020, S260819.

"'allows a judge to take into account the nature and severity of the crime, as well as the individual's culpability, during sentencing'" and "'provides judges the ability to impose sentences that fit the severity of the offense, helping to ensure that incarcerated Californians do not serve unnecessarily long sentences'"]; Sen. 3d reading analysis of Sen. Bill No. 620 (2017-2018 Reg. Sess.) as amended June 15, 2017, p. 3 [Senate Bill No. 620 "'allows a judge to exercise discretion on whether or not to make a long sentence longer if it is in the interest of justice'"].)

The conclusion of the courts in *Tirado* and *Garcia* that trial courts do not have discretion to impose a 10- or 20-year enhancement under section 12022.53, subdivision (b) or (c), if the court strikes or dismisses a 25-years-to-life enhancement under section 12022.53, subdivision (d), was based on the rationale that "[n]othing in the plain language of sections 1385 and 12022.53, subdivision (h) authorizes a trial court to substitute one enhancement for another." (*Tirado*, *supra*, 38 Cal.App.5th at p. 643, review granted; see *Garcia*, *supra*, 46 Cal.App.5th at p. 791 ["section 12022.53, subdivision (h) confers the authority to 'strike or dismiss' a firearm enhancement set forth in section 12022.53" and "says nothing about substituting or modifying enhancements"].) As the court in *Tirado* stated, "This language indicates the court's power pursuant to these sections is binary: The court can choose to dismiss a charge or enhancement in the interest of justice, or it can choose to take no action. There is nothing in either statute that conveys the power to change, modify, or substitute a charge or enhancement." (*Tirado*, at p. 643.)

But the question is not whether the court has the "binary" discretion "pursuant to" the plain language of section 12022.53,

43

subdivision (h), to impose a lesser enhancement after the greater enhancement has been stricken or is otherwise unavailable. The question is whether the plain language of section 12022.53, subdivision (h), takes away discretion the court already has. And it doesn't. As the concurring opinion in *People v. Valles* (2020) 49 Cal.App.5th 156, review granted July 22, 2020, S262757, explained: "The question is not whether *the amended statute conveys the power to impose an uncharged lesser enhancement* (or change or modify an enhancement). Rather, the question is whether, having exercised its power under the amended statute to strike a greater enhancement, *the court still has its previously recognized power to impose an uncharged lesser*." (*Id.* at p. 171 (conc. opn. of Menetrez, J.).)

## DISPOSITION

The convictions are affirmed. The trial court is directed to exercise its discretion whether to impose a lesser firearm enhancement under section 12022.53.


SEGAL, J.


We concur:


PERLUSS, P. J.            FEUER, J.